Daniel CHECCHIO, a Minor, By and Through His Parents and Natural Guardians, J. Michael and Patricia CHECCHIO, Appellant,

v.

FRANKFORD HOSPITAL–TORRESDALE DIVISION, Edwin R. Concors, M.D. Michael Malen, M.D., Marvin Kalafer, M.D., Carl Kennedy, Jr., M.D. Children's Hospital, Appellees.

Superior Court of Pennsylvania.

Argued June 2, 1998.

Filed Sept. 22, 1998.

Glenn C. McCarthy, Philadelphia, for appellant.

Edward C. Mintzer, Jr., Philadelphia, for Frankford Hospital, etc., appellees.

Peter J. Hoffman, Philadelphia, for Edwin R. Concors, M.D., appellee.

Before KELLY, J., and CERCONE, President Judge Emeritus, and MONTEMURO *, J.

MONTEMURO, Judge:

This is an appeal from an order entering summary judgment in favor of the defendants in a medical malpractice action.

On February 17, 1984, minor Plaintiff/Appellant Daniel Checcio was born a month prematurely by Caesarian section at Appellee Frankford Hospital. Only minutes after birth the child began exhibiting signs of respiratory distress, later diagnosed as due to hyaline membrane disease.[1] This condition required the administration of supplemental oxygen which was supplied in increasing amounts by oxygen hood. In the early hours of February 18, 1984, Daniel was intubated and transferred to Children's Hospital where he was placed on a ventilator. He was discharged from Children's on March 2, 1984 with a diagnosis of preemie grower status, respiratory distress syndrome.

Within two years, the child was diagnosed with pervasive developmental disorder, autism and severe mental retardation. Suit was instituted on the basis that Appellees' negligence in managing Daniel's respiratory distress syndrome led to neonatal hypoxia, oxygen deprivation to the tissues of the body, the proximate cause of his permanent neurological dysfunction.

■ The action was commenced by writ of summons on June 2, 1989,[2] and the Complaint was lodged on October 12 of the same year. Appellants filed an amended complaint in response to Appellees' Preliminary Objections on December 8, 1989. After the completion of certain discovery proceedings not germane to this appeal,[3] Appellees filed a joint Motion in Limine in anticipation of trial to determine the admissibility of Appellants' scientific/medical evidence. An order was entered directing Appellees to depose Appellants' experts regarding the "substance and foundation" of their proposed testimony. (Order dated 1/18/95). On the basis of these depositions, Appellees filed a motion for summary judgment asserting that the evidence supporting Appellants' claims failed to meet the standards for such testimony enunciated in *Frye v. U.S.*, 293 F. 1013 (D.C.1923), and adopted by the Supreme Court of Pennsylvania in *Commonwealth v. Topa*, 471 Pa. 223, 369 A.2d 1277 (1977). After oral argument, the motion was granted, and this appeal followed.

On appeal, two issues are presented, the first a challenge to the conclusion that the *Frye* admissibility standard was not met, and the second an assertion that the trial court's decision reflected a ruling on the relative credibility of the parties' experts in violation of the doctrine set forth in *Nanty–Glo Borough v. American Surety Co.*, 309 Pa. 236, 163 A. 523 (1932). We will address these seriatim.

The standard for determining whether summary judgment is properly entered is that, "a non-moving party must adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor. Failure to adduce this evidence establishes that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Ertel v.*

---

* Retired Justice assigned to Superior Court.

1. Hyaline membrane disease is a condition related to immaturity of the lung.

2. Although Appellees' New Matter contains an averment that suit was barred by the applicable statute of limitations, the issue was never pursued. "The statute of limitations is a procedural bar to recovery which may be waived by explicit consent or by conduct." *Cobbs v. Allied Chemical Corp.*, 443 Pa.Super. 386, 661 A.2d 1375, 1378 (Pa.Super.1995), *appeal denied*, 543 Pa. 707, 672 A.2d 303 (1996).

3. As a result of these proceedings, several of the original defendants were released from the case, leaving only three: Frankford Hospital, Michael Malen, M.D., and Edwin R. Concors, M.D.

*Patriot–News Co.*, 544 Pa. 93, 101–02, 674 A.2d 1038, 1042 (1996), *cert. denied,* — U.S. —, 117 S.Ct. 512, 136 L.Ed.2d 401 (1996).

■ The proof required for a *prima facie* showing of negligence is that a duty was owed and breached, the breach was the cause of the injury, and damages resulted from the harm thus caused. *Mitzelfelt v. Kamrin*, 526 Pa. 54, 62, 584 A.2d 888, 891 (1990). Where the alleged negligence is medical in nature, the plaintiff must present evidence from an expert "who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered." *Id.* at 62, 584 A.2d at 892. For expert evidence to be admissible, it must meet the standard enunciated in *Frye*, and adopted by our Supreme Court in *Topa*, which is that "[a]dmissibility of the evidence depends upon the *general* acceptance of its validity by those scientists active in the field to which the evidence belongs." *Topa*, 471 Pa. at 231, 369 A.2d at 1281 (emphasis in original). In *Blum v. Merrell Dow Pharmaceuticals*, 705 A.2d 1314 (Pa.Super.1997), this Court, following *Topa*, ruled that the analysis to be applied in answering the question of whether the Frye/Topa admissibility criterion had been met was two pronged: acceptance in the scientific community of first the causal, and then the methodological relationship alleged. *Id.* at 1322.

■ The crux of Appellants' argument and the logical construct on which their case is grounded begins with the major premise that a lack of oxygen and blood flow to the brain can cause neurologic damage. Daniel suffers neurologic damage, the argument proceeds, therefore the damage must have been caused by oxygen deprivation. The corollary to this conclusion is that "the damage may manifest itself in the severe mental retardation, development delay and autistic like behavior exhibited by Daniel Checcio." (Appellants' Brief at 7). Thus, after the assertion of

hypoxia as a causative agent of Daniel's mental retardation, there is further a strongly implied causative role for the retardation as a precondition, or rather explanation, for his autistic behavior. It should be also be noted that Appellants' Complaint at no point mentions either retardation or autism, merely "severe brain damage." (Complaint at 10).

The trial court found that Appellants' experts failed to demonstrate "any scientific basis, other than their own subjective beliefs, that autism and/or pervasive developmental disorders are caused by hypoxia in the context of respiratory distress or Respiratory Distress Syndrome." (Trial Court Opinion at 17). However, despite acknowledging the prevalence of the *Frye* test, the court applied the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), as less stringent. There the United Supreme Court abandoned the use of *Frye* in the federal system, positing instead Federal Rule of Evidence 702.[4] While such an analysis is incorrect under current Pennsylvania law, as the court points out a witness who fails to meet the requirements of *Daubert* necessarily fails to meet the more restrictive *Frye* standard as well. Therefore, while we find the trial court's reliance on *Daubert* to be in error, for the reasons that follow we find its substantive conclusions as to the admissibility of Appellants' expert testimony to be correct.

Of the experts relied on to establish their cause of action, Appellants refer to two as principal sources for the necessary quantum of causation evidence: Leon L. Charash, M.D., a pediatric neurologist, and Ralph J. Wynn, M.D., a neonatologist. Dr. Charash, who conducted a physical examination of Daniel, opined that some time during the 12 hours after birth, Daniel suffered oxygen deprivation, hypoxia, due to respiratory stress syndrome resulting in brain injury, specifically mental retardation with behavioral and communication problems. He testi-

4. The Rule reads as follows:
    If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowl-

edge, skill, experience training, or education, may testify thereto in the form of an opinion otherwise.
F.R.E. 702.

fied that he would not use the word autism in connection with Daniel, and opined that a purely autistic child would not have had the problems at birth that Daniel experienced. Moreover, the doctor asserted that Daniel has "pervasive behavioral manifestations which are seen in mentally retarded people *per* se." (Deposition Testimony of Leon Charash at 94). Thus, the explanation advanced for Daniel's condition was that oxygen deprivation caused mental retardation which manifested itself in deficits of behavior and communication. Dr. Charash testified that these conclusions were based entirely on his own observations and experience in the field, without any reference to outside sources on which he might predicate his findings.

Dr. Wynn opined that Daniel, suffering from hyaline membrane disease, was marginally oxygenated resulting in hypoxia persisting for approximately 9 hours, that is, until the transport team from Children's Hospital performed the intubation. This prolonged period of oxygen debt with accumulating metabolic acidosis resulted in his neurological disability. Dr. Wynn also stated that this combination, the oxygen debt and the metabolic acidosis, which affects all tissues of the body, was the insult to Daniel's brain causing the neurologic deficits. He opined, however, that there was no concomitant motor dysfunction.

Dr. Wynn, too, denied that Daniel was autistic, rather defining his neurological impairment as a cognitive disorder affecting his mental and language functions, and his ability to interact with his environment. These findings were informed entirely by Dr. Wynn's own knowledge and experience, with some reference to the empirically based information supplied by Dr. Charash's examination of Daniel. Both the experts specifically denied reliance on any documented scientific authority for the proposi-

tion that impairments of the type from which Daniel suffers are caused by perinatal hypoxia.[5]

Appellants argue that these opinions are sufficient to satisfy *Frye* because, "[i]t is a well established fact in the medical community that a lack of oxygen to the brain will eventually cause hypoxia and if severe and prolonged enough it will result in acidosis and eventual death of brain tissue." (Appellant's Brief at 10). While this may well be true, it does not explain whether the specific condition from which Daniel suffers is the result of brain tissue death or some other cause, or why, since oxygen deprivation affects all tissues according to Dr. Wynn, Daniel demonstrates no accompanying motor deficits, only impairment to that part of the brain which governs intelligence and communication. Nor, again, even accepting the validity of Appellants' major premise, does it serve to connect the autistic tendencies with the brain injury. There is no testimony, and no evidence of any other sort, to the effect that such tendencies always occur in conjunction with hypoxic brain damage, or indeed with mental retardation. Appellants themselves assert somewhat tentatively that the neurologic dysfunction allegedly caused by the putative hypoxia **may** cause the condition exhibited by Daniel (Appellants' Brief at 7)(emphasis added); they paraphrase their own experts, who are actually more positive in their assessment, as asserting that "a lack of oxygen **can** cause brain damage." (*Id.* at 5)(emphasis added). No authority, statistical or otherwise is offered on these points.[6]

■ Appellants contend that the absence of such documentation is not controlling, and that the issue of what caused Daniel's tragic condition should be tested before a jury, where Appellees' position can be protected through cross examination. This dependence on cross examination as the instrument by which to gauge an expert's veracity was not-

---

**5.** There is, indeed, some dispute by Appellees' experts, based on interpretation of the blood gas values taken at various times during the 12 hours following Daniel's birth, as to whether hypoxia actually occurred.

**6.** Appellants contend that no studies are possible to document the experts' opinions here because

such studies require that a control group be subjected to hypoxia to determine its ultimate effect. Appellants seem unwilling to distinguish between analysis of clinical data available on already afflicted patients, and experiments conducted on laboratory subjects.

▮▮▮▮▮▮▮▮▮▮▮▮▮

ed by our Court in *Blum, supra,* and dismissed on the basis that unless the evidence on which the expert's testimony is deemed reliable, it should not be presented to a jury. *Id.* at 1322. The reason is inherent in the rationale behind the use of expert testimony, which is that it must be helpful in elucidating matters of which the jury might otherwise remain ignorant. But if the testimony is not trustworthy from the outset, it can mislead, and by so doing undermine the truth determining process. The reliability quotient is set by *Frye,* and applied by the trial court, which does not, as we stated in *Blum,*

> decide whether the propositions or theories are true or false. Rather the judge as gatekeeper decides whether the expert is offering sufficiently reliable, solid, trustworthy science. The question is: is the science good enough to serve as the basis for the jury's findings of fact, or is it dressed up to look good enough, but basically so untrustworthy that no finding of fact can properly be based on it. If the latter is true the integrity of the trial process would be tainted were the jury to consider it.

*Id.*

In *Blum* the claim was advanced that the minor plaintiff's birth defect, clubfeet, was caused by his mother's ingestion during pregnancy of the drug Bendectin, manufactured by defendant pharmaceutical company. The trial court was faced with testimony containing sophisticated statistical probabilities and epidemiological evidence, and determined that the single expert who opined unequivocally as to the connection between the drug and the birth defect had presented unreliable data; he had failed to establish that the existence of the causal relationship was accepted in the relevant medical community, *id.* at 1322–23, or that the methodology used to arrive at the conclusion that there was a causal nexus was consistent with epidemiological standards. *Id.* at 1324. Indeed, the expert had not published his conclusions so as to subject them to peer review.

Here the trial court's task was simpler, to gauge the reliability of experts whose proposed testimony, although informed by reports of other experts involved in the case, scrupulously avoided the medical literature and was based entirely on subjective assessments of both cause and effect. The trial court noted that despite an order to set forth both the "foundation and substance" of the experts' opinions, Appellants had provided no diagnostic imaging which would supply clinical proof of the brain damage Daniel was alleged to have sustained under Appellee's care, nor did Appellants offer research, conducted by their own experts or anyone else, to support their assertions on causation or diagnosis. Under these circumstances, the trial court properly found that the evidence was too inherently unreliable to be presented to the jury.

▮▮▮▮ Appellants also argue that the trial court's decision on admissibility was actually an appraisal of credibility, in violation of *Nanty–Glo, supra,* in favor of Appellees' experts. The rule established there is that oral testimony alone is generally insufficient to establish the absence of material fact necessary for the entry of summary judgment. In discussing this rule, Appellants' rely on *Ertel v. Patriot News Co., supra,* to which the trial court had referred in addressing Appellants' claim. After reciting the facts of *Ertel,* Appellants state, "No where (sic) in this case was the issue of the credibility of a witness' testimony before the court." (Appellants' Brief at 14). Inadvertently, Appellants have defined their own situation. The reliability of the experts they produced was measured against the standard for admissibility set by *Frye/Topa,* not against testimony submitted by Appellees. No reference to Appellees' evidence was necessary to decide that Appellants had failed to posit a question of material fact.

Judgment affirmed.