**Thomas v. West Bend Company Inc.**

*Joseph L. Messa, Jr.,* for plaintiff.
*Basil A. DiSipio,* for defendant West Bend Co.
*Richard M. Donaldson, Patricia Larson, Larry L.*

*Turner* and *Cynthia M. Binnon,* for defendant G.J. Rossi & Son.

*Pamela A. Carson,* for defendant Irwin H. English Co.

BERNSTEIN, *J.,* February 17, 2000—Plaintiff's complaint alleges that on April 1, 1993 he received a severe low voltage electrical shock injury while plugging a West Bend Two Corn Popper into a receptacle. Plaintiff alleges claims against various defendants in negligence and products liability. In response to expert interrogatories, plaintiff submitted a report of Dr. Nicholas L. DePace.

## I. THE EXPERT

Dr. DePace is a medical doctor specializing in cardiology. He has been board certified in cardiology for 15 years and in internal medicine for 17 years. He is a Fellow of the American College of Cardiology, a Fellow of the American College of Chest Physicians, and a member of the Pennsylvania Medical Society, the American Medical Association and the New York Academy of Sciences. He is affiliated with numerous hospitals in the Philadelphia area including the Graduate Hospital where he is chief of the division of preventive cardiology. He is also a clinical professor of medicine at the Medical College of Pennsylvania and an assistant professor of medicine at Jefferson University. He is the author of 23 abstracts and 65 publications in the medical literature dating back to 1980. He is the co-author of chapters in five textbooks. Dr. DePace's work is limited to his cardiology specialty. There is no challenge presented to Dr. DePace's qualifications to offer expert opinion testimony in the field of cardiology. He is extremely qualified.

At the request of plaintiff's counsel, Dr. DePace reviewed the medical records of plaintiff Otis Thomas. He found that plaintiff is a 24-year-old black male with no significant cardiac history prior to sustaining an electric shock. Dr. DePace noted that on the date of this shock and on the day following, the plaintiff sought medical attention complaining of abdominal pain, constitutional symptoms, severe pain in his left arm and shoulder and swelling of the left hand. Four days after the incident, the plaintiff was seen at Temple University where a diagnosis of cephalalgia was made and visual complaints noted. The plaintiff was admitted to Temple Hospital on August 8, 1993, where it was noted that he had severe cardiomyopathy. Three months later he was admitted to St. Joseph's Hospital because of shortness of breath, chest pain, palpitations, and epigastric pain.

## II. THE OPINION

Dr. DePace's opinion, offered to a reasonable degree of medical certainty, is that the electrical injury sustained by plaintiff was the "only possible etiology for this patient's rather acute development of cardiomyopathy following the accident." Dr. DePace's opinion is that the plaintiff experienced an electrical current injury to his heart resulting in myocardial necrosis with myocardial contusion and resultant congestive heart failure. In Dr. DePace's opinion these conditions have required recurrent hospitalizations, presently require that the plaintiff take cardiac medication, and will require a heart transplant.

## III. THE MOTION

Well in advance of trial, defendant West Bend Company sought in limine to preclude plaintiff from introducing Dr. DePace's expert opinion testimony causally connecting plaintiff's heart condition to the April 1, 1993 accident. Defendant relied upon *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013 (D.C. Cir. 1923) as adopted by the Pennsylvania Supreme Court in *Commonwealth v. Topa,* 471 Pa. 223, 369 A.2d 1277 (1977). Pursuant to this motion the court took live testimony, received affidavits and directed that depositions be taken.[1]

---

1. There has recently been a dramatic increase in the number of motions to preclude expert opinion testimony based upon *Frye* in trial courts in Pennsylvania. There are no rules providing procedure for such motions. Different judges have adopted different procedural approaches.

There is no required time for presenting a *Frye* motion. Counsel seeking to preclude expert opinion have filed motions well in advance of trial. Other attorneys have filed motions in limine for pretrial ruling just before trial. Some counsel have waited until the expert witness has been called to the witness stand or even after the direct testimony has been completed before asserting a motion to preclude or strike. At a CLE panel, on which the author participated, a highly respected defense attorney suggested that a motion to strike on the basis of *Frye* could be raised for the first time on post-verdict motion.

In this case, the court heard days of live testimony on the motion to preclude. Concluding that the exigencies of a busy judicial trial calendar and the trial schedules of the various attorneys precluded a full examination by live testimony, the court required that all additional testimony be presented by deposition. Accordingly, in evaluating this motion, the court adopted an approach that encompassed all permutations in attempting to establish a full and complete record for the proper ruling of this virtually dispositive motion. The court has before it affidavits, has received live and deposition testimony and has accepted medical literature in evidence.

## IV. THE SCIENCE

Defendant challenges, as without consensus support in the relevant scientific and medical communities, the proposition that low voltage electric shock can cause dilated cardiomyopathy. All parties agree that plaintiff Otis Thomas sustained a "low voltage electric shock" in the accident and all parties agree that plaintiff Otis Thomas is presently suffering from "dilated cardiomyopathy."

In formulating his conclusion, Dr. DePace examined the plaintiff, reviewed the plaintiff's medical records and reviewed the medical literature. None of the medical literature identify low voltage electrical shock as a cause of dilated cardiomyopathy.

Dr. DePace testified that although there are numerous reports of electricity causing cardiomyopathic processes, he knew of only two specific articles which imply that low voltage electrical shock can cause a clinical picture which is not identified as cardiomyopathy in the articles but which Dr. DePace classifies as "dilated cardiomyopathy." [2]

Dr. DePace agrees that the diagnosis of "idiopathic dilated cardiomyopathy" is accepted in the medical profession. In those cases, there is no known etiology associated with the clinical presentation of cardiomyopathy. Dr. DePace further agrees that other causes for dilated cardiomyopathy include alcohol, drugs, vitamin deficiencies, viruses, chemicals, toxins, and lead exposure. Dr. DePace is aware of no animal studies relevant to the question of whether low voltage electrical shock can cause dilated

2. Neither of the two incidents or patients described in the two articles parallel the medical picture in this case.

cardiomyopathy. He is aware of no epidemiologic study on this phenomena. He can present no theory of the mechanism by which this injury is sustained from low voltage electric shock. Despite having treated approximately 1,000 patients with cardiomyopathy in his 20 years of clinical practice, Mr. Thomas is the first patient that he has ever diagnosed with dilated cardiomyopathy caused by low voltage electrical shock.[3]

Dr. DePace is presently working with Dr. Bruno and Dr. Elbaum on a draft manuscript for publication in the medical literature to present his conclusion that low voltage electrical shock is a previously unidentified cause of dilated cardiomyopathy.[4] At page 10 of that draft article, Dr. DePace's conclusion concerning the plaintiff in this case is identified as a "newly described" etiology.[5] Not yet submitted to any journal for review or publication, his draft article, if published and accepted in the relevant medical community, will advance medical knowledge.

## V. NEW SCIENTIFIC EVIDENCE: *DAUBERT* AND *FRYE*

Since federal court standards for expert testimony were announced in *Daubert v. Merrell Dow Pharmaceuticals Inc.*[6] the scientific validity of expert testimony has become a significant focus of federal court litigation. This activity is reflected in a tremendous increase in the number of motions to preclude expert testimony presented in this state court. The adoption of the Pennsylvania Rules

---

3. N.T. 5/1/98 at p. 32.
4. N.T. 5/1/98 at p. 28.
5. N.T. 5/1/98 at p. 28.
6. 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

of Evidence, which parallel the critical rules on which the United States Supreme Court relied in adopting the *Daubert* standard, has further heightened interest and uncertainty in Pennsylvania in this critical area. Supreme and Superior Court decisions and the notes to those very rules,[7] make clear that the evidence code did not change the law of Pennsylvania in this regard. Nonetheless, this remains a troubling area of the law.[8] Accordingly, it is incumbent in this opinion to clearly and fully explicate this court's understanding of the law of Pennsylvania. Only thereby can an appellate court determine whether the law was properly understood and applied.

The seminal case for this discussion is, of course, *Frye v. United States,*[9] setting forth the criteria for the admissibility of new scientific evidence. *Frye* itself set forth standards for admissibility of a new "scientific" test that purported to evaluate credibility, the "lie-detector test." Although *Frye* was concerned only with a "lie-detector test," the archetypical "black box" that miraculously provides the true answer through the magic of modern science, the principles adopted in *Frye* have been applied across the entire spectrum of expert testimony.

The *Frye* test was adopted in Pennsylvania in 1977 in the case of *Commonwealth v. Topa,*[10] another "black box" technology ruling, holding that spectrograms and opinion evidence about spectrography which produces "voice prints" was inadmissible. The Supreme Court next ap-

---

7. See 1998 comment to Pa.R.E. 702.

8. The Supreme Court has said: "We leave to another day whether *Daubert* will be adopted." That day has not yet arrived.

9. 54 App.D.C. 46, 293 F. 1013 (D.C. Cir. 1923).

10. 471 Pa. 223, 369 A.2d 1277 (1977).

plied the *Frye* test in *Commonwealth v. Nazarovitch,*[11] precluding evidence based upon the new "scientific technique" of hypnotically refreshed testimony, holding that the reliability of the technique had not been established. In *Commonwealth v. Dunkle*[12] the Supreme Court first precluded evidence grounded in a new scientific theory. In *Dunkle,* the court stated that testimony based upon the theory of "child sexual abuse syndrome" was inadmissible because the very concept that such a syndrome existed had not been generally accepted in the field of psychology. Applying *Frye* in *Commonwealth v. Zook,*[13] the Supreme Court permitted testimony based on electrophoresis analysis of the enzymes in dried blood stains, finding that the technique had achieved general acceptance in the field of forensic serology.

The application of the *Frye* standard in Pennsylvania to new scientific evidence was explicated by the Supreme Court in *Commonwealth v. Crews.*[14]

"When scientific advances produce new types of evidence, admissibility of such evidence depends on the test first laid down in *Frye v. United States.*"[15] (citation omitted)

"Just when a scientific principle or discovery crosses the line between the experimental or demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific prin-

---

11. 496 Pa. 97, 436 A.2d 170 (1981).
12. 529 Pa. 168, 602 A.2d 830 (1992).
13. 532 Pa. 79, 615 A.2d 1 (1992).
14. 536 Pa. 508, 640 A.2d 395 (1994).
15. 54 App.D.C. 46, 293 F. 1013 (1923).

ciple or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field to which it belongs." [16]

In *Crews,* the Supreme Court upheld the lower court ruling permitting testimony based upon the result of DNA testing. Nonetheless, the Supreme Court drew a fine scientific distinction in what was admissible. The court held that opinion evidence specific statistical conclusions were inadmissible. The court said: the conclusion to be drawn from the statistical information accumulated to date regarding DNA matches had not achieved widespread acceptance within the scientific community and therefore is inadmissible in evidence.[17] In *Crews,* the expert opinion was permitted that the match of three out of four loci made it "more probable than not that the sperm was that of the defendant." *Id.* at 523, 640 A.2d at 402. The expert was precluded from presenting an opinion to any greater precision. The court in *Crews* held that *Frye* determinations are essentially case-specific to be determined on appeal by the record created below. The court did not rule that statistical analysis of DNA evidence could never be admissible. The court said: "We hold merely that the record compiled in this case does not include evidence sufficient to satisfy *Frye,* though an exhaustive *Frye* hearing might reach a different result." [18]

In *Crews,* the Supreme Court also responded to the United States Supreme Court ruling in *Daubert.* The court noted that *Daubert* relaxed the admissibility of novel

---

16. *Crews,* 536 Pa. at 517-18, 640 A.2d at 399.

17. *Crews,* 536 Pa. at 522, 640 A.2d at 402.

18. *Id.* at 522 n.4, 640 A.2d at 402 n.4.

scientific evidence by interpreting and applying the Federal Rules of Evidence which are, of course, not applicable in Pennsylvania. In a much quoted footnote, the Supreme Court said: "Whether or not the rationale of *Daubert* will supersede or modify the *Frye* test in Pennsylvania is left to another day." [19] Since that day has not yet arrived, the decision in this case is controlled by the stricter Pennsylvania law of *Frye*.

## VI. THE HOOPS [20]

Likewise, the intermediate appellate courts have been asked to hold that *Daubert* considerations can overcome the consensus requirement of *Frye*. Both the Commonwealth Court and the Superior Court have definitively ruled that consensus of opinion in the relevant scientific community is required for the admissibility of novel expert opinion evidence in Pennsylvania.

The intermediate appellate courts first addressed *Frye* in the context of *Daubert* in *McKenzie v. Westinghouse Electric Corp.*[21] Plaintiff McKenzie's daughter was diagnosed with ventricular septal defect at birth. The plaintiffs alleged that contaminants in the water, TCE and DCE, caused the birth defect that eventually led to the

---

19. *Id.* at 519 n.2, 640 A.2d at 400 n.2.

20. "An expert witness is qualified to offer an opinion if he or she has sufficient skill, knowledge, or experience in a field or calling as to make it appear that his or her opinion or inference will probably aid the trier in its search for truth. *Dambacher [by Dambacher] v. Mallis,* 336 Pa. Super. 22, 485 A.2d 408 (1984). To be admissible, expert evidence on scientific matters must pass through an additional *hoop*." *Blum v. Merrell Dow Pharmaceuticals Inc.,* 705 A.2d 1314, 1316-17 (Pa. Super. 1997). (emphasis added)

21. 674 A.2d 1167 (Pa. Commw. 1996), *appeal denied,* 547 Pa. 733, 689 A.2d 237 (1997).

child's death. Expert testimony by three respected scientists who relied upon medical literature linking these contaminants to cardiac defects was excluded by the trial court, and the panel of Commonwealth Court judges affirmed. On appeal, the McKenzies did not claim that the proposition that these contaminants are human teratogen was generally accepted in the teratological community. The plaintiffs argued that it was sufficient to demonstrate that the methodologies employed in scientific studies which found a causative connection, were generally accepted by the relevant scientific community. Citing several published animal and epidemiological studies incorporating methodologies that were generally accepted in the scientific community, the McKenzies claimed that the law of Pennsylvania permitted opinion testimony based thereon.[22] The Commonwealth Court clearly found otherwise:

"[I]n order for scientific testimony indicating that an event causes a particular result to be admitted, there must be a showing, not that the studies establishing the causal relationship follow generally accepted methodologies, but that the existence of the causal relationship is generally accepted by the relevant medical community."[23]

Lest this holding be misunderstood, in conclusion, the court repeated:

---

22. Plaintiffs presented three renowned experts in teratology, who testified that the studies were valid scientific studies, and the opinions based upon them were scientifically derived conclusions. The defendants offered renowned experts who criticized the studies and testified that no consensus had yet been achieved as to whether TCE or DCE caused birth defects.

23. *McKenzie,* 674 A.2d at 1172.

"In light of the numerous cases applying the *Frye* test, the relevant inquiry in the present case is whether the scientific principle forming the basis for Dr. Goldberg's opinion has gained general acceptance in the field of teratology; it is not whether the methodologies employed in Dr. Goldberg's studies are scientifically valid." [24]

Since the McKenzies "offered no evidence to establish that the conclusions from those studies are generally accepted in the teratological community, the specific medical field to which they belong," the testimony was not permitted. [25] Thus, according to *McKenzie,* the scientific conclusion, the opinion itself, must meet the *Frye* test to be admissible.

Appellate courts next addressed this question in the case of *Blum v. Merrell Dow Pharmaceuticals Inc.* [26] The Superior Court applied a dual analysis. The Superior Court found two ways to analyze the question of whether the causation testimony proffered met the *Frye/Topa* standard. The first focused on whether the causal relationship had achieved general acceptance, the traditional *Frye* test. The second focused "on whether the methodology is generally accepted by the scientific community," a *Daubert*-type evaluation. The Superior Court ruled that *both* criteria must be met for admissibility in Pennsylvania. The Superior Court referred to these criteria as hoops superimposed upon the long-standing requirement of *Dambacher by Dambacher v. Mallis* [27] that "[a]n expert witness is qualified to offer an opinion if [the expert] has sufficient skill, knowledge, or experience in a field or

24. *Id.* at 1172.
25. *Id.* at 1172.
26. 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
27. 336 Pa. Super. 22, 485 A.2d 408 (1984).

calling as to make it appear that the opinion or inference will probably aid the trier of fact in its search for truth."[28] The Superior Court ruled that the "gatekeeper" role of the trial judge in Pennsylvania requires both a *Frye* analysis and a *Daubert* analysis be met for admissibility of novel expert opinion evidence.[29] Thus, the decision in *Blum* may have made Pennsylvania the most restrictive jurisdiction in the nation, requiring both *Frye* and *Daubert* standards be met as separate tests before opinion evidence based upon new science could be admissible in evidence.

This dual test was ameliorated by the Superior Court in 1998 in the matter of *Checchio v. Frankford Hospital-Torresdale Division*.[30] In *Checchio,* the plaintiff presented expert witnesses who testified that the plaintiff minor child's developmental disorders, including autism and mental retardation, were due to a lack of oxygen and blood flow to the brain at birth. Based on the scientifically accepted proposition that the lack of oxygen and blood flow to the brain can cause neurological damage, the experts grounded their opinions on the "clinical" conclusion that this damage "may manifest itself in severe mental retardation, developmental delay, and autis-

---

28. *Blum, supra* at 1316-17.

29. This formulation has caused some confusion since the less restrictive *Daubert* analysis is necessarily incorporated into the *Frye* test. If the relevant scientific community accepts a conclusory proposition, it can only be because that same scientific community has reviewed the methodology and deems it appropriate. Under such a circumstance, a gatekeeper judge should be hard-pressed to independently conclude that although the proposition is accepted by a consensus of the relevant scientific community, the methodology is unscientific.

30. 717 A.2d 1058 (Pa. Super. 1998).

tic[-]like behavior . . . ."[31] Both experts, Leon L. Charash M.D., a pediatric neurologist, and Ralph J. Wynn M.D., a neonatolist, relied solely upon their extensive knowledge, experience, and clinical judgments. They specifically denied reliance on any "documented scientific authority for the proposition that impairments of the type from which Daniel suffers are caused by perinatal hypoxia."[32] No challenge was presented to their qualifications to formulate opinions or to the reasonableness of acting upon their opinions in providing medical care based upon their clinical opinions. The defense challenged this testimony as new medical conclusions. The trial court in *Checchio* performed the *Blum* dual analysis and found that the proposed expert testimony failed to meet either the *Frye* or *Daubert* test. The Superior Court rejected the dual analysis:

"In *Blum v. Merrell Dow Pharmaceuticals,* . . . this court, following *Topa,* ruled that the analysis to be applied in answering the question of whether the *Frye/Topa* admissibility criterion had been met was two pronged: acceptance in the scientific community of first the causal, and then the methodological relationship alleged."[33]

The court affirmed the trial court preclusion order, but gave specific and clear instruction to trial courts saying:

"However, despite acknowledging the prevalence of the *Frye* test, the [trial] court applied the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals Inc.* . . . as less stringent. There the United [States] Supreme Court abandoned the use of *Frye* in the federal system, posit-

---

31. *Checchio,* 717 A.2d at 1060.

32. *Id.* at 1061.

33. *Id.* at 1060. (citations omitted)

ing instead Federal Rule of Evidence 702. While such an analysis is incorrect under current Pennsylvania law, as the court points out a witness who fails to meet the requirements of *Daubert* necessarily fails the more restrictive *Frye* standard as well. Therefore, while *we find the trial court's reliance on Daubert to be in error,* for the reasons that follow we find its substantive conclusions as to the admissibility of appellant's expert testimony to be correct." [34]

The Superior Court found that since the expert testimony: "scrupulously avoided the medical literature and was based entirely on subjective assessments of both cause and effect" the evidence was "too inherently unreliable to be presented to the jury." [35]

Most recently, in *Commonwealth v. Blasioli,* 552 Pa. 149, 713 A.2d 1117 (1998), the Supreme Court was asked to determine whether evidence of statistical probabilities calculated using the product rule is admissible in a criminal case to assist the trier of fact in assessing the probative significance of a DNA match. Ruling that the product rule in DNA forensic analysis is generally accepted in the relevant scientific communities and is not the type of novel scientific evidence to which Pennsylvania courts apply the *Frye* test, the Supreme Court affirmed the trial court ruling admitting the evidence. The Supreme Court reaffirmed that the *Frye* test applied only to novel scientific evidence and held: "In determining whether novel scientific evidence is admissible in criminal trials, . . . such evidence must have gained general

---

34. *Id.* at 1060. (citation and footnote omitted) (emphasis added)
35. *Id.* at 1062.

acceptance in the relevant scientific community." [36] In discussion, the court clearly and unambiguously required that first, the relevant scientific communities be determined, and second, that general consensus or general acceptance in those scientific communities must be demonstrated. Defining consensus, the Supreme Court said: "While we are cognizant of the fact that unanimity among scientists does not exist, unanimity is not required for general acceptance." [37]

Thus, the cases interpreting *Frye* in light of the *"Daubert"* distraction lead directly to several conclusions. First, that the *Frye* test applies only to novel scientific theories; second, that general consensus, not unanimity, in the relevant scientific or medical community is required for admissibility; and third, that since *Daubert* is not the law of Pennsylvania, a *Daubert*-type analysis is permissible only insofar as it is relevant to the question of scientific *"Frye"* consensus. Finally, the purpose of the *"Frye"* rule is to insure that the jury receives only opinion testimony that will assist in the determination of factual questions. Finally, it is the court's responsibility to insure that the quality of this opinion will assist the jury and not mislead them.

## VII. THE MEDICAL MALPRACTICE EXCEPTIONS TO *FRYE:* I. INCREASED RISK OF HARM

In one recent case, novel opinion evidence was accepted, based exclusively on clinical judgment. That case involved the lesser evidentiary standard of "increased

---

36. *Blasioli,* 713 A.2d at 1119.
37. *Id.* at 1127.

risk of harm." In *Smith v. Grabb*,[38] President Judge Cirillo held admissible expert opinion testimony on "increased risk of harm," despite the complete absence of supporting literature. Judge Cirillo wrote:

"Dr. Singer's failure to cite an article or text on point goes to the weight of his testimony, not its admissibility. The basis of Dr. Singer's testimony was his knowledge, education, reading and experience of 25 years as a practicing oncologist. Based upon such experience, he was able to offer an opinion that the delay in Mrs. Smith's diagnosis increased her risk of a shortened life expectancy. See *Joyce*, 694 A.2d at 656 (this court determined that it was not necessary to have an expert doctor cite to treatises and medical periodicals to support his articulation of the standard of care; his 30 years in the field of orthopedic medicine was sufficient to support an opinion regarding the relevant standard of care)."[39]

The court noted that by their very nature, cases in which the claim is that a failure to diagnose and treat a patient's condition caused injury, elude the degree of certainty one would prefer and upon which the law normally insists. In reversing a nonsuit and remanding the case for trial, the Superior Court said:

"[W]e note that the court's role in the instant case was merely to establish whether there was testimony presented that the failure to detect Mrs. Smith's cancer in a timely fashion increased the risk that she suffered harm, *i.e.*, a shortened life expectancy."[40]

Once expert opinion evidence of increased risk of harm is offered, it is the function of the jury, not the medical

38. 705 A.2d 894 (Pa. Super. 1997).

39. *Smith*, 705 A.2d at 900-901.

40. *Id.* at 900.

expert or the court, to balance probabilities and decide whether the appellee's negligence was a substantial factor in bringing about harm.

Novel medical opinion that a failure to diagnose created an increased risk of harm, however, does not require the same consensus scrutiny for admissibility. Such opinion is admissible based on clinical judgment alone, without reference to any supporting literature. Such opinion is controlled only by *Dambacher by Dambacher v. Mallis.*

## VIII. THE MEDICAL MALPRACTICE EXCEPTIONS TO *FRYE:* II. TWO SCHOOLS OF THOUGHT

In *Jones v. Chidester,* 531 Pa. 31, 610 A.2d 964 (1992), the Supreme Court said:

"Where competent medical authority is divided, a physician will not be held responsible if in the exercise of his judgment he followed a course of treatment advocated by a considerable number of recognized and respected professionals in his given area of expertise." [41]

The burden rests with the proponent of the "Two schools of thought doctrine" to demonstrate that there is adequate factual support for the claim that there are a considerable number of professionals who agree with the treatment.[42]

For a medical school of thought to exist, its concepts, theories and standards must necessarily have achieved an acceptable level of scientific and medical acceptance

---

41. *Jones,* 531 Pa. at 40, 610 A.2d at 969.

42. See *Bonavitacola v. Cluver,* 422 Pa. Super. 556, 619 A.2d 1363 (1993), *appeal denied,* 535 Pa. 652, 634 A.2d 216 (1993).

that evidence that a medical school exists does not mislead the trier of fact. As such, testimony of the existence of a "new or novel" medical school of thought is a definable subset of novel scientific evidence generally.

In *Tesauro v. Perrige*,[43] a medical malpractice case decided by the Supreme Court in 1994, the trial court refused to charge the jury on the defense of "two schools of thought." The plaintiff claimed no legitimate second school of medical thought existed.

Mrs. Tesauro required the surgical removal of a damaged lower left molar. After successful surgery by Dr. Perrige, Mrs. Tesauro developed a dry socket. To treat this condition, Dr. Perrige administered an alcohol injection. The plaintiff's face immediately went into muscle spasms, resulting in nerve damage and a permanent burning feeling. The defense presented only one expert witness, who testified that alcohol injections to treat intractable pain was "well-known in . . . the literature."[44] He referred to a single text from 1875 and a single manual written in 1961. He conceded that treatment by alcohol injection was not mentioned in any other scholarly article or text. He testified that he does not give alcohol injections and has never taught that alcohol injections are an acceptable treatment for dry socket. Performing a *Frye*-like evaluation of novel scientific testimony, the Superior Court ruled that: "The writings and teachings of one individual are inadequate factual support for the proposition that a considerable number of professionals agree with this treatment."[45] Thus, the Superior Court

---

43. 437 Pa. Super. 620, 650 A.2d 1079 (1994).

44. Apparently there was no objection to this testimony raised at trial.

45. *Tesauro,* 437 Pa. Super. at 627, 650 A.2d at 1083.

affirmed the decision to preclude the two schools of thought defense.

In a comparable case, the Supreme Court analyzed the two schools of thought doctrine differently. In *Gala v. Hamilton*,[46] allocatur was granted to address the single issue of whether a defendant must present medical literature to justify a "two schools of thought" instruction.

Justice Nigro writes that medical literature should be required to support the opinion that a medical school of thought exists. He states in dissent:

"Such a requirement would recognize that a school of thought as it is used in the two schools doctrine is more than a spontaneous agreement among an ad hoc group of colleagues. Rather, it is by definition a more formal mode of practice, system or discipline with its own theoretical basis, medical principles, and protocol. . . .

"Further, in order to be a 'school,' the approach, technique, treatment or procedure must be communicated to others who adopt and follow those methods. The shared teachings only become a school when the followers are numerous and the protocol is established, understood, and embraced at least among the defined group of disciples. As such, a considerable number of reputable and respected practitioners has long been the requirement in Pennsylvania in order to constitute a school. . . . The unadopted beliefs, writings and teachings of one individual provide inadequate factual support for a school of thought. . . .

---

46. 552 Pa. 466, 715 A.2d 1108 (1998).

"Unless and until other reputable and respected colleagues adopt the advocated approach, it is only a theory and not a 'school.' "[47]

Thus, Justice Nigro would require evidence of "professional literature, descriptive of and in support of the defendant's course of treatment" to prove that "competent medical authority is divided." Mr. Justice Castille joined in Justice Nigro's dissenting opinion.

The majority of the Supreme Court, however, held that no supporting medical literature was needed. The Supreme Court held that without any supporting literature, opinion evidence that a medical school of thought existed does assist the jury. If opinion testimony is offered that the course of treatment is "advocated by a considerable number of recognized and respected professionals," the existence of such a "school" can constitute a complete defense to a claim of medical malpractice.

Mr. Gala had surgery for a benign tumor in his neck. This surgery, performed under local anesthesia, became more complicated than initially envisioned when it was learned that the tumor had encircled a branch of his spinal accessory nerve. Plaintiff claimed that he sustained a permanent injury during this surgery. Plaintiff claimed the defendant was negligent in performing the operation under local anesthesia "because it restricted the operative field and the ability of the surgeon to observe the operative field adequately." Plaintiff's expert testified that the use of local anesthesia increased the risk and thereby caused the injury. The defense claimed the defendant correctly followed one of two accepted medical tech-

---

47. *Gala v. Hamilton,* 552 Pa. 466, 481-82 and n.1, 715 A.2d 1108, 1116 and n.1 (1998).

niques. The plaintiff denied that any second school of thought existed.

For the defense, Dr. Myers testified that both he and a considerable number of reputable and respected physicians throughout the world used local anesthesia for this type of surgery. He could refer, however, to only one other doctor who employed local anesthesia, and that was a physician who removed thyroid tumors in India. Dr. Myers conceded that he could find no reference in the medical literature. A second expert, Dr. William M. Keen, likewise testified for the defense that the medical literature makes no reference to anesthesia.

The majority of the Supreme Court reaffirmed that the burden of demonstrating the existence of two schools of medical thought is on the proponent but ruled that there is no requirement of any specific number of followers to constitute a school. The Supreme Court held:

"Once the expert states the factual reasons to support his claim that there is a considerable number of professionals who agree with the treatment employed by the defendant, there is sufficient evidence to warrant an instruction to the jury on the two 'schools of thought.' It then becomes a question for the jury to determine whether they believe that there are two legitimate schools of thought such that the defendant should be insulated from liability."[48]

The Supreme Court majority rejected any specific literature requirement. The Supreme Court explained that:

"Limiting evidence to medical literature would have the effect of preventing expert witnesses from testifying to the existence of a school of thought based on their

---

48. *Id.* at 1110-11.

experience as practitioners and on information they obtained during their medical training and while attending lectures and other educational programs sponsored by institutions and professional societies. Furthermore, in cases where medical literature is silent with regard to certain techniques or treatments, the lack of written materials would necessarily be fatal to the defendant's claim."[49]

Reaffirming prior law, the Supreme Court held that once an individual is qualified to provide expert testimony pursuant to *Dambacher,* an expert can offer to the jury the opinion that a medical school of thought exists even where there is no medical literature supporting the opinion. The Supreme Court further reaffirmed that the testimony of an expert "alone establishes that a considerable number of recognized and respected professions advocate the course of treatment followed by the defendant,"[50] and that cross-examination was sufficient protection for the jury's fact-finding function. With respect to this medical malpractice defense, no judicial gatekeeping is required. The Supreme Court reaffirmed that the lack of supporting medical literature was significant only as to the weight of the evidence and not its admissibility.

Thus, in two distinct areas of medical negligence claims, namely the doctrines of "medical schools of thought" and "increased risk of harm," opinion evidence

---

49. *Id.* at 1111. (The majority did not ignore the apparently opposite Superior Court opinion in *Tesauro;* the court explained that *Tesauro* stands for the proposition "that while factual support is required for a two schools instruction, it need not be in the form of medical literature, but may be testimonial." *Gala,* 522 Pa. at 473, 715 A.2d at 1112. The Supreme Court noted that neither of the two experts in *Tesauro* actually used the medical technique they claimed constituted a school.)

50. *Gala* at 479, 715 A.2d at 1114.

by a witness qualified pursuant to *Dambacher* will assist the jury, even without any supporting medical or scientific literature. No support beyond the expert opinion itself is needed for admissibility. The "clinical" or experimental judgment and opinions of qualified expert witnesses are admissible even as to novel theories of increased risk or as to the existence of a previously unknown "medical school of thought." Plaintiff herein urges this court to apply these exceptions to *Frye*. Neither exception is applicable.

## IX. APPLICATIONS

In this products liability claim, plaintiff directly contends that the novel opinion of Dr. DePace, that low voltage shock directly causes myocardiopathy, should be admissible because an eminently qualified expert has honestly drawn this conclusion by using appropriate medical and scientific methodologies and applying his training, education and experience.

Plaintiff urges this court to analyze Dr. DePace's methodology alone and find it reasonable and therefore a "consensus scientific extension" of known and well-accepted principles. Plaintiff's expert hopes to advance the state of medical knowledge by publishing his conclusions concerning a new etiology for cardiomyopathy. He finds his conclusion concerning this patient worthy of publication in the medical literature. His draft article describes his conclusion as a "newly described" etiology. He acknowledges that he is attempting to create a consensus acceptance in the relevant medical-scientific community.

Neither his exemplary qualifications, nor his extensive experience, nor the soundness of the methodology is sufficient to overcome the novelty of his scientific advance. Although significant questions remain for resolution by the Supreme Court of Pennsylvania in this

504

thorny area, a state trial court, unlike the federal district court, may not "predict" the rulings of the Supreme Court.[51] A state trial court's responsibility is to understand and apply the law. Although a trial court has wide discretion concerning the admissibility of evidence, discretion is not unbounded. As this court understands the law, the court's exercise of evidentiary discretion to bar Dr. DePace's opinion, to close the courtroom gates, and thereby preclude plaintiff a day in court, should be affirmed.

For the reasons set forth above the decision of the trial court should be affirmed.

---

51. See *Dillinger v. Caterpillar Inc.,* 959 F.2d 430 (3d Cir. 1992) (stating: "In deciding this case we must give due consideration to the decisional law of inferior state courts but we need not give those decisions binding effect."); *West v. American Telephone & Tel. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 183 (1940), accord *Burke v. Maassen,* 904 F.2d 178, 182 (3d Cir. 1990); *McKenna v. Ortho Pharm. Corp.,* 622 F.2d 657, 662 (3d Cir.), *cert. denied,* 449 U.S. 976, 101 S.Ct. 387 (1980); see also, *Hall v. Wilkerson,* 926 F.2d 311 (3d Cir. 1991) (Fullam, Sen. Dist. J., dissenting).