**Deena DOWNEY, Administratrix of the Estate of Gertrude Downey, Deceased, Appellant**

**v.**

**CROZER–CHESTER MEDICAL CENTER, Appellee.**

Superior Court of Pennsylvania.

Argued Nov. 7, 2002.

Filed Feb. 7, 2003.

---

Marvin I. Barish, Philadelphia, for appellant.

Barbara S. Magen, Philadelphia, for appellee.

Before: DEL SOLE, P.J., McEWEN, P.J.E., HUDOCK, JOYCE, STEVENS, TODD, KLEIN, BENDER, and GRACI, JJ.

GRACI, J.

¶ 1 Appellant Deena Downey ("Downey"), Administratrix of the Estate of Gertrude Downey ("Decedent"), appeals from an Order granting the Motion For Summary Judgment filed by Crozer–Chester Medical Center ("Crozer"). We affirm the order of the trial court.

## I. Factual and Procedural History

¶ 2 Downey relies exclusively on the facts as set forth in Dr. Blumberg's expert report dated August 23, 1999. *See* Brief for Appellant, at 2–8, R.R., at 28a–33a. The facts contained in Dr. Blumberg's report will be set forth in their entirety. They remain undisputed.

¶ 3 Dr. Blumberg's expert report, sent to Gregory L. Nester, Esquire, and dated August 23, 1999, set forth the following:

Dear Mr. Nester:

Pursuant to your request, I have completed my review of the records supplied by your office concerning Gertrude Downey, a forty-six year old woman who drowned on November 30, 1995 while she was a patient at the Crozier–Chester Medical Center. The purpose of this record review was to determine whether the care and treatment rendered to Ms. Downey deviated from the standard of care and, if so, whether any such deviation directly led to her death. In order to address these issues, I reviewed the following documents:

1. Certificate of Death;

2. Report by Office of the Medical Examiner;

3. Records from Crozier–Chester Medical Center;

4. Records of Antonio Sacre, M.D.;

5. Records from the Medical Center of Delaware;

6. Records from Saint Francis Hospital;

7. Records from Wilmington Hospital;

8. Records from Mediplex–Rehab, Camden;

9. Records from Delaware State Hospital;

10. Records from Family Practice Associates;

11. Records from Springfield Hospital;

12. Records of Stanley Bilski, D.O.; and,

13. Records of Otto Medinella, M.D.

Ms. Downey first received outpatient psychiatric treatment from Antonio Sacre, M.D. in September 1987. She was seen for anxiety and depression but had continued to be gainfully employed, was divorced and took care of her daughter. Doctor Sacre noted a history of some regular alcohol usage.

Ms. Downey continued to function adequately until July 6, 1992. She had experienced frequent headaches for the previous three weeks, unrelieved by medication. She also experienced dizziness and photophobia. She was forty-two years old at the time and there was a history that her sister died at the age of forty-two as the result of a subarachnoid hemorrhage. Ms. Downey was admitted on that date to the Medical Center of Delaware, where she was found to have a right subarachnoid hemorrhage and a right temporal intracerebral bleed as a result of a ruptured aneurysm of the right middle cerebral artery. An angiogram also revealed an unruptured left middle cerebral artery aneurysm. She underwent surgery on July 7, 1992, to clip the right middle cerebral artery aneurysm.

Ms. Downey underwent successful surgery and was readmitted to the Medical Center of Delaware from October 6, 1992 through October 14, 1992 for repair of her left middle cerebral artery aneurysm. Postoperatively, however, Ms. Downey developed considerable confusion and memory difficulties. She was noted to have adhesions in the Sylvian fissure and a right hemiparesis and aphasia which improved somewhat. She was subsequently transferred to the Wilmington Hospital for rehabilitation but was returned that day for the intensive cognitive and rehabilitation program at the Medical Center of Delaware. She remained in the hospital until November 12, 1992, at which point her boyfriend took her out of the hospital against medical advice. She returned to the emergency room the following day, intoxicated and was readmitted.

The records from the Medical Center of Delaware from her readmission of November 13, 1992 through December 11, 1992 revealed that following her October surgery, Ms. Downey developed cognitive deficits, including anxiety, agitation, poor insight and aphasia. She had a premorbid history of depression and alcohol dependence and was found to be in need of rehabilitation and a supervised atmosphere. The records revealed that medication needed to be given with the supervision of her family. It was recommended that she continue on phenobarbital, 30 mg., four times a day, as a result of having postoperative seizures. She was also prescribed Xanax, 0.5 mg., four times a day as needed. She was given a diagnosis of Organic Personality Disorder with Impulsivity

that slowly improved, pathological crying, which improved on the antidepressant Prozac, and it was noted that she experienced delirium which was resolved by treatment with Haldol. On discharge, the record indicated that Ms. Downey needed twenty-four hour supervision with sitters.

Ms. Downey was next seen at Saint Francis Hospital on April 13, 1993 and was next admitted to Saint Francis Hospital from May 9, 1993 through May 27, 1993. At the time of her admission, she was described as depressed, wanting to kill herself and could not cope with daily life. She was diagnosed as suffering from Schizoaffective Disorder, Substance Abuse—Alcohol, and a Seizure Disorder.

The medical records revealed that she was next seen at the Wilmington Hospital in August, 1993 and, after being evaluated at the emergency room at Christiana Hospital, was admitted again to the Medical Center of Delaware from August 23, 1993 through January 11, 1994. She was noted to be very impulsive, intrusive and had agitated outbursts, along with memory difficulties. She had been brought to the emergency room after a fight with her former husband, whom she accused of stealing her apartment keys. She was described as a poor historian. It was noted that she had been on the street panhandling for money and was quite mentally and socially impaired. The records revealed that she had been high functioning prior to her aneurysm despite the history of depression and anxiety. She had also had a history of alcohol use for years. She remained on a locked unit for 4½ months at the Medical Center of Delaware. Neuropsychological testing during that hospitalization revealed serious cognitive impairment, dysphasia, dysnomia, amnestic disorder and visual spatial disturbance. The testing revealed "profound neuropsychological deficits present in this patient". She was also noted to be unable "to function in any context of daily life". The record further noted that she was not likely to function in any independent capacity and it was recommended that she have a guardian and be placed in a long-term treatment facility. Despite being a high school graduate, intelligence testing revealed a full-scale IQ of 64, a verbal IQ of 69 and a performance IQ of 62, which falls in the range of mild mental retardation. She was given a discharge diagnosis of Organic Mental Disorder, Not Otherwise Specified and discharged directly to Mediplex Rehab, Camden.

Ms. Downey remained at Mediplex Rehab, Camden from January 11, 1994 through March 21, 1994. On admission, she was described as paranoid and hypersexual. Although she had functioned at home after her original surgery, her behavior began deteriorating to the point that she required recurrent psychiatric hospitalizations in August 1993. She was described as having no control over her appetite. While in the hospital, she gradually improved to become independent in ambulation and all activities of daily living. She was also described as being continent of bowel and bladder 100% of the time. It was felt that she could function in a home environment with structure and supervision. She was given diagnoses of Traumatic Brain Injury with Organic Mental Syndrome, Secondary to Subarachnoid Hemorrhage from Right and Left Middle Cerebral Artery Aneurysms, Cognitive and Behavioral Deficits and Anxiety Disorder Predating.

Ms. Downey remained home for a very brief period of time before she was admitted to Delaware State Hospital

from May 5, 1994 through July 13, 1994. She was admitted on emergency certificates as a result of drinking, misusing medication, leaving home and threatening to kill herself while drinking. She was diagnosed as suffering from Psychotic Disorder, Not Otherwise Specified, Organic Brain Syndrome and Alcohol Abuse, Episodic.

Ms. Downey apparently functioned marginally until she was re-admitted to Delaware State Hospital from September 30, 1994 through March 3, 1995. That record indicated that Ms. Downey had been transferred from Wilmington Medical Center in May, 1994 to Delaware State Hospital. Upon discharge from her first admission, her daughter could not maintain her at home due to Ms. Downey's affective instability, childlike manipulative behavior and lack of judgment and insight concerning her own safety. It was noted that she ate erratically and frequently left home at all hours. Her most destructive behavior was secondary to her poor judgment. While hospitalized, she frequently asked for kisses and made sexual comments to other patients and staff. On sign-outs, she walked away from her mother and daughter and was described as seductive and manipulative of staff. Ms. Downey was diagnosed as suffering from Personality Change (Disinhibited) Due to Bilateral Cerebral Aneurysms; Alcohol Abuse and Neuroleptic–Induced Tardive Dyskinesia. While in the hospital, she was on special precautions which involved fifteen minute checks. She did have passes with her family which were always escorted. She did not demonstrate seizure activity during the hospitalization. She was placed on Tegretol, 200 mg., four times a day; Inderal, 20 mg., four times a day; Visteril, 50 mg., six times a day; and BuSpar, 5 mg., six times a day. She was subsequently discharged to the Brookwood Retirement Home, where she remained from March, 1995 until her next psychiatric hospitalization on October 10, 1995.

While at the Brookwood Retirement Home, Ms. Downey received outpatient care from the Family Practice Associates. She was also re-admitted to the Medical Center of Delaware from March 11, 1995 through March 15, 1995. She had been getting out of a bathtub when she fell and sustained a right trimalleolar fracture. She underwent a closed reduction in the emergency room and subsequent open reduction and internal fixation of the medial and lateral malleoli under anesthesia. It was noted that she was returned to the Brookwood Retirement Home as a result of continuing to be in need of twenty-four hour a day care.

Ms. Downey remained at the Brookwood Retirement Home until October 10, 1995, when she was admitted to Springfield Hospital. She had been seen at Springfield Hospital on September 19, 1995 as a result of alcohol intoxication. She was re-admitted to Springfield on October 10, 1995 as a result of alcohol ketoacidosis, acute duodenal ulcer, acute gastritis and a history of Bipolar Disorder. She had been abusing alcohol and complaining of abdominal pain and nausea. Her metabolic condition was stabilized and it was decided that she needed to be transferred to a psychiatric unit. Her medication at the time of discharge included Klonopin, 0.5 mg. per day; Effexor, 37.5 m., twice a day; Tegretol, 200 mg., four times a day; and Ativan, 1 mg., every four hours as needed. A CT scan of the head revealed bilateral infarcts in the distribution of the middle cerebral arteries.

Ms. Downey was admitted to the Crozier–Chester Medical Center on October

20, 1995 as a direct admission from Springfield Hospital. The record revealed that she had been living at the Brookwood Retirement Home but had been engaging in out-of-control drinking which led to her recent hospitalization at the Springfield Hospital. On Admission, she was described as confused and noncompliant, along with being very disorganized. She was intrusive, labile and incontinent of urine and complained of dizziness and orthostatic difficulties. A history of seizure disorder was noted but seizures had not been recently active. She was given an admission diagnosis of Organic Mood Disorder, Bipolar Type, and initially received Tegretol, 200 mg., three times a day and 400 mg. at bedtime; Ativan, 0.5 mg., twice a day; Lithobid, 300 mg., twice a day; Risperidal, 2 mg., twice a day; and Cogentin, 0.5 mg. per day. The progress notes revealed that Ms. Downey was resistent [sic] to getting bathed and needed firm limits and assistance with her activities of daily living. She wore adult diapers, was described as disheveled and disorganized and would touch male patients. She required direct supervision of her activities of daily living and required bathing with assistance.

During the days prior to her death, Ms. Downey continued to demonstrate significant psychiatric/neurological difficulties. On November 25, 1995, she was described as incontinent of her bowel movements, along with drooling and her speech being loose. On November 26, 1995, she was described as hostile most of the morning. She had been taken to the shower and washed thoroughly and Desiten had been applied to her buttocks. However, she continued to drool and demonstrated flat affect. On November 27, 1995, she was described as child-like. On November 29, 1995, she

was described as labile, intrusive, needy and tearful.

On November 30, 1995, at 1340 hours, Ms. Downey was pronounced dead. It was believed that she died as a result of accidental drowning. She was given final diagnoses of Dementia, Organic Mood Disorder, Status Post–Two Cerebrovascular Accidents, Orthostatic Hypertension; and Accidental Drowning.

According to the report of the Office of the Medical Examiner, Ms. Downey was bathing herself and was last seen between 12:30 and 12:40 p.m. She was found face-down without vital signs. On Autopsy, her cause of death was determined to be drowning. She was also diagnosed as having encephalopathy secondary to bilateral cerebral aneurysms of the middle cerebral arteries. A history of bilateral cerebral craniotomies was noted. There were extensive post-surgical atrophy and infarction of the cerebral hemispheres bilaterally, right being greater than the left. A history of Seizure Disorder, Personality Disorder and Neurological Deficits, along with hepatic steatosis and a remote Fallopian tubal ligation. Contributory causes to her death were encephalopathy with seizure disorder. The report revealed that she had been admitted to Crozier–Chester Medical Center on October 20, 1995 on a 302 Order as a result of her inability to care for herself. At the time of death, she was found to have a therapeutic carbamazepine (Tegretol) level.

As a result of my review of the above-noted materials, it is my opinion, to a reasonable degree of medical probability, that Gertrude Downey died as a direct result of the deviation from the standard of care rendered by the staff at the Crozier–Chester Medical Center. Ms. Downey suffered from multiple cognitive deficits that caused significant impairment in her social and occupational

functioning and represented a significant decline from her prior level of functioning. These deficits were caused by her middle cerebral aneurysms and the surgeries that she underwent to correct those conditions. At times, she had demonstrated depression and delirium and had always had significant behavioral disturbance. The most appropriate diagnosis for her condition appears to be Vascular Dementia with Behavioral Disturbance (DSM–IV: 290.40). Although the staff at the Crozier–Chester Medical Center adequately diagnosed her condition and were attempting to treat her behavioral difficulties, it is quite clear, even from their own records, that Ms. Downey required direct supervision of all of her activities, including bathing and showering. Her tendency to be confused and out of control of her behavior, along with problems of dizziness, orthostasis and a prior history of seizures, required that she be directly supervised at all times. Her prior history in March, 1995 of fracturing her ankle while bathing placed the hospital on even greater notice that she was physically incapable of safely handling even bathing. The hospital staff's failure to directly monitor Ms. Downey, in my opinion, directly led to her death by drowning. It is not clear whether Ms. Downey drowned as a result of fainting, a seizure or a slip and fall. Regardless of the specific event, her condition mandated direct supervision of bathing activities. Had this been done, it is unlikely that she would have died as a result of drowning. The hospital staff, including, by extension, her treating physician, in my opinion, all share responsibility for Ms. Downey's unfortunate and preventable death.

I trust that this information will be of assistance to you. If and when you have any further information that you would like me to consider, I would be happy to provide an addendum to this report. If you have any further questions, please do not hesitate to contact me.

Very truly yours,

s/Neil Blumberg, M.D.

R.R. 28a–33a.

¶ 4 Downey, as Administratrix of Decedent's Estate, commenced the instant lawsuit on September 25, 1997, in the Court of Common Pleas of Delaware County, alleging negligence on the part of Crozer in connection with Decedent's death. On March 26, 2001, the trial court granted Crozer's Motion for Summary Judgment. This timely appeal followed.

¶ 5 It should be noted, that the order granting the Motion for Summary Judgment was vacated by a panel of this Court by an unpublished memorandum filed on April 19, 2002. Crozer's Motion for Reconsideration was granted, the April 19, 2002, memorandum was withdrawn, and argument was heard before an *en banc* panel of this Court. This opinion follows the *en banc* argument.

¶ 6 Two issues are presented for our review:

1. Whether the trial court erred in holding that the Pennsylvania Mental Health Procedures Act ["MHPA"], 50 PA.C.S.A. §§ 7101, *et seq.*, is applicable to this case.

2. Whether the trial court erred in finding as a matter of law that Downey could not establish gross negligence.[1]

---

1. These issues are interrelated. If the MHPA does not apply then liability could follow a finding of simple negligence. As will be demonstrated, the MHPA does apply so gross negligence is the minimum standard of care.

## II. DISCUSSION

¶ 7 Our Supreme Court has set forth the standard to be followed in reviewing appeals from a grant of summary judgment as follows:

A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. *Capek v. Devito,* [564 Pa. 267] 767 A.2d 1047, 1048, n. 1 (Pa.2001). As with all questions of law, our review is plenary. *Phillips v. A–Best Products Co.,* 542 Pa. 124, 665 A.2d 1167, 1170 (1995).

In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. "Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof .... establishes the entitlement of the moving party to judgment as a matter of law." *Young v. PennDOT,* 560 Pa. 373, 744 A.2d 1276, 1277 (2000). Lastly, we will review the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*Murphy v. Duquesne University Of The Holy Ghost,* 565 Pa. 571, 777 A.2d 418, 429 (2001) (citation omitted).

■ ¶ 8 Downey's first allegation of error is that the trial court erred when it applied the MHPA to the instant case, providing immunity from liability to Crozer. Specifically, Downey argues that the MHPA does not apply to Crozer because Decedent's accident was not the direct result of a treatment decision, but rather, was the result of an administrative breakdown that led to Decedent being permitted to bathe alone. We disagree.

¶ 9 The immunity provision of the MHPA provides in pertinent part as follows:

§ 7114. Immunity from civil and criminal liability

(a) In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be examined or treated under this act, ... shall not be civilly or criminally liable for such decision or for any of its consequences.

50 P.S. § 7114(a). Under the MHPA, a "facility" is "any mental health establishment, hospital, clinic, institution, center, day care center, base service unit, community mental health center, or part thereof, that provides for the diagnosis, treatment, care or rehabilitation of mentally ill persons, whether as outpatients or inpatients." 50 P.S. § 7103. "Treatment" is defined as "diagnosis, evaluation, therapy, or rehabilitation needed to alleviate pain and distress and to facilitate the recovery of a person from mental illness and shall also include care and other services that supplement treatment and aid or promote such recovery." 50 P.S. § 7104. Thus, we must determine if Crozer was a "facility" providing treatment to Defendant for, if it was, Crozer is immune from suit in the absence of "gross negligence." [2]

2. The statutory immunity also falls if the facil-       ity engages in "willful misconduct." That

¶ 10 Our Supreme Court has determined that the immunity provided by the MHPA extends to institutions, as well as natural persons, that provide care to mentally ill patients. *Farago v. Sacred Heart General Hospital*, 522 Pa. 410, 562 A.2d 300, 303 (1989). Additionally, our Supreme Court has interpreted § 7114(a) to include not only treatment decisions, but also, " 'care and other services that supplement treatment' in order to promote the recovery of the patient from mental illness." *Allen v. Montgomery Hospital*, 548 Pa. 299, 696 A.2d 1175, 1179 (1997).

¶ 11 As a hospital that provides inpatient psychiatric care, Crozer is most certainly an institution to which the provisions of the MHPA apply. *See Farago*, 562 A.2d at 303. Decedent was involuntarily committed to the inpatient psychiatric care of Crozer, and its staff monitored Decedent as part of her medical care. In *Allen*, our Supreme Court interpreted the MHPA to apply to the daily care and other services provided to a patient as part of the patient's overall psychiatric treatment. *See Allen*, 696 A.2d at 1179. Therefore, we conclude that the MHPA applies to Crozer and consequently, that the trial court did not err by applying its immunity provisions when it granted summary judgment.

■ ¶ 12 Downey's second issue alleged error by the trial court when it found as a matter of law that Downey failed to establish that Crozer acted with gross negligence. Our Supreme Court engaged in a thorough analysis of the meaning of the phrase "gross negligence" within the context of the MHPA in *Bloom v. Dubois Regional Medical Center*, 409 Pa.Super. 83, 597 A.2d 671 (1991). The Court found, "that the legislature intended the term gross negligence to mean a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference. The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care." *Id.* at 679. The Court reaffirmed the validity of this definition when it opined in a later case that the definition of the phrase "gross negligence", as articulated in the decision of this Court in *Bloom*, is a "clear, reasonable, and workable definition of gross negligence which is consistent with the purposes and intent of the Act." *Albright v. Abington Memorial Hospital* 548 Pa. 268, 696 A.2d 1159, 1164 (1997). In quoting, *Bloom*, the Supreme Court declared: "We hold that the legislature intended the term gross negligence to mean a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference. The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care." *Id.* at 1164.

¶ 13 We recognize that the limited immunity provided by section 7114 would mean little if the persons or entities covered by that provision were required to undergo trial in every case and leave it to a jury to determine if the complained of misdeeds (if there were any) rose to the level of gross negligence.

■ ¶ 14 On the very issue of whether the jury has the sole right to determine gross negligence, Justice Cappy declared:

While it is generally true that the issue of whether a given set of facts satisfies the definition of gross negligence is a question of fact to be determined by a jury, a court may take the issue from a jury, and decide the issue as a matter of law, if the conduct in question falls short of gross negligence, the case is entirely

provision is not at issue here.

free from doubt, and no reasonable jury could find gross negligence.

*Id.* at 1164–65, citing *Willett v. Evergreen Homes, Inc., et. al.,* 407 Pa.Super. 141, 595 A.2d 164 (1991), *alloc. denied,* 529 Pa. 623, 600 A.2d 539 (1991). Justice Cappy then continued and stated:

> Never did the Bloom court indicate that where, as here, a plaintiff asserts gross negligence but establishes only ordinary negligence, summary judgment would be precluded. A more logical and sound reading of the proposition set forth in *Bloom* is that the determination of whether an act or failure to act constitutes *gross* negligence is for a jury, but may be removed from consideration by a jury and decided as a matter of law only where the case is entirely free from doubt and there is no possibility that a reasonable jury could find *gross* negligence.
>
> To require mental health employees and their employers to defend jury trials on the issue of gross negligence where the trial judge finds as a matter of law that, at best, only ordinary negligence has been established, would gut the limited immunity provision of the Act of any meaning and unfairly subject such employees and facilities to protracted and expensive litigation.

*Id.* at 1165. In our review of the trial judge's finding that no reasonable jury could find gross negligence, we remain mindful that Crozer's behavior must be determined to be flagrant and grossly deviating from the ordinary standard of care. *See Albright, supra; Bloom, supra.*

¶ 15 We first return to the undisputed facts set forth above in Dr. Blumberg's expert report. We note that the report was transmitted to counsel for Downey on or about August 23, 1999. In that report, Dr. Blumberg concluded only that, in his opinion, "to a reasonable degree of medical probability," Gertrude Downey died "as a direct result of the deviation from the standard of care rendered by the staff of the [Medical Center]." Letter, 8/23/99 at 5, R.R. 32a. At no point in his report does Dr. Blumberg specify what standard of care or procedures or policies were ignored or violated by the Crozer staff. Dr. Blumberg does not indicate what portion of the medical data that he reviewed was within the knowledge or possession of the Crozer staff at the time of, or following the Decedent's admission on October 20, 1995. Nor does he opine as to how much of the medical data concerning the Decedent's past history from 1987 to October 1995 should have been known to Crozer.

¶ 16 Dr. Blumberg acknowledges that Crozer's staff members "adequately diagnosed [the Decedent's] condition and were attempting to treat her behavioral difficulties. . . ." *Id.* at 6. Dr. Blumberg's only criticism of Crozer was averring that its staff did not directly supervise the Decedent while bathing. Significantly, he characterized this alleged failure as only a deviation from the standard of care. At no time in his August 23, 1999, report, did Dr. Blumberg give an opinion that the actions of the Crozer staff constituted gross deviations from the applicable standard of care. Furthermore, he failed to describe what any such gross deviations might have been. There is nothing in Dr. Blumberg's report which in any way indicates, or gives the impression, that he views this case as involving anything other than ordinary negligence.

¶ 17 Our review of the facts of this case, excluding the Blumberg report, indicates that the alleged failure to supervise the Decedent while bathing constituted nothing more than ordinary "carelessness, inadvertence, laxity or indifference." *See Bloom,* 597 A.2d at 679. There is no evidence in the record that the Decedent

suffered any seizure activity while at Crozer or at Springfield Hospital prior to her admission to Crozer. Downey concedes that the decision of whether or not a psychiatric patient should be permitted to bathe is, in fact, a treatment decision. Appellant's Brief, at 9. There is no evidence that Dr. Donovan, Decedent's treating physician placed any restrictions or limitations on Decedent's bathing. Crozer Motion for Summary Judgment, 2/23/01, Exhibit B. Furthermore, the Decedent was given a full day "pass" or "leave of absence" from Crozer to spend the day with her daughter only seven days prior to her death. *Id.* at 3, ¶ 5. The Decedent had no history of depression or suicidal ideation during her admission at Crozer. She was last observed at approximately 12:40 p.m., on November 30, 1995. Ten minutes later she was found unconscious in the bathtub. The autopsy report provided no information on how the drowning actually occurred. The report indicates that the death was the result of accidental drowning. Contributory causes included encephalopathy, secondary to bilateral cerebral aneurysms with seizure disorder. The toxicology report did not find any evidence of toxic levels of medication, alcohol or street drugs. *Id.* at ¶ 7. A thorough review of the record leads us to conclude that the Decedent's death, while unfortunate, was accidental. There was no indication of gross negligence on the part of the Crozer staff in the record. At most, their failure to supervise Downey for the entire period of bathing constituted ordinary carelessness, inadvertence, laxity or indifference which fails to give rise to a cause of action under the MHPA. The August 23, 1999, expert opinion tendered by Dr. Blumberg supports this conclusion.

¶ 18 We are aware that Dr. Blumberg filed an addendum to his August 23, 1999, report dated March 16, 2000, again addressed to Gregory Nester, Esquire, counsel for Downey, which stated as follows:

Dear Mr. Nester:

As an addendum to my report of August 23, 1999, it is my opinion, to a reasonable degree of medical probability, that the actions of the hospital that directly contributed to Ms. Downey's death on November 30, 1995 constitute gross negligence as defined as "a form of negligence where the facts indicate more egregiously deviant conduct than mere ordinary carelessness, inadvertence, laxity or indifference."

If you have any further questions, please do not hesitate to contact me.

Very truly yours,

s/Neil Blumberg, M.D.

Downey's Response to Crozer's Motion for Summary Judgment, 3/21/01, Exhibit B. We note that Dr. Blumberg's addendum appears to have been dated two weeks after the filing of the Motion for Summary Judgment by Crozer on March 2, 2000. The addendum repeats verbatim the definition for "gross negligence" set forth in paragraph 9 of Crozer's motion: "a form of negligence where the facts indicate more egregiously deviant conduct than mere ordinary carelessness, inadvertence, laxity or indifference." Defendant Crozer's Motion for Summary Judgment, 2/23/01, ¶ 9. Because the addendum does not attempt to set forth or refer to any material facts not otherwise contained in his earlier report, we are unable to afford any weight to what appears to be an upward modification of his earlier professional opinion.

¶ 19 We note two recent decisions of our Supreme Court relative to Pa.R.C.P. 1035.3(b). In *Wolloch v. Aiken*, —— Pa. ——, 815 A.2d 594 (2002) the Court found that expert reports, submitted after the entry of summary judgment pursuant to a

motion to vacate the summary judgment order were untimely. The Court reversed the order of this Court and upheld the grant of summary judgment by the trial court because the plaintiff could not establish a *prima facie* case without expert testimony. In dicta, the Court suggested that the proper procedure would have been to file the reports as a supplement to the response to the motion for summary judgment per Pa.R.C.P. 1035.3(b) (citing *Gerrow v. John Royle & Sons*, —— Pa. ——, 813 A.2d 778 (2002)).

¶ 20 In *Gerrow*, a plurality decision of our Supreme Court with no precedential value, *see Commonwealth v. Price*, 543 Pa. 403, 672 A.2d 280 (1996), the majority appears to agree that expert opinions can be attached to a response to a motion for summary judgment pursuant to Pa.R.C.P. 1035.3(b).[3]

¶ 21 We find the case *sub judice* distinguishable from *Wolloch* and *Gerrow*. Dr. Blumberg's addendum was attached as a supplement to Downey's response to Crozer's Motion for Summary Judgment and therefore timely, per *Wolloch*. However, the addendum provided no new informa-

tion. Dr. Blumberg made no effort to supplement the facts on which he based his original opinion, but sought only to modify his opinion as to the degree of Crozer's negligence. We note that Downey was previously unsuccessful in defeating the Motion for Summary Judgment filed by Althea Donovan, M.D., the Decedent's treating physician, when supported only by Dr. Blumberg's 8/23/99 expert report, excluding the 3/23/00 addendum. *See Gerrow*, at 780 (observing that several expert reports which were filed in response to summary judgment motion "were allegedly sufficient to make out a *prima facie* case against Appellants").

¶ 22 An expert's opinion must be supported by references to facts, testimony or empirical data and must delineate how the opinion, based on the record, gives rise to a genuine issue of material fact. Without such support, there can be no prima facie case of gross negligence sufficient to overcome a summary judgment motion. *Kenner v. Kappa Alpha Psi Fraternity, Inc.*, 808 A.2d 178 (Pa.Super.2002) (affirming entry of summary judgment where an expert's opinion contained within a report, failed to point to specific facts, testimony

---

**3.** The *Gerrow* Court, however, was severely divided regarding the disposition of the attached reports. Justice Zappala, found that supplemental expert reports, allegedly sufficient to make a *prima facie* case of negligence, were not precluded from consideration by the trial judge because of the "coordinate jurisdiction" rule. *Gerrow*, 813 A.2d at 782–83. Justice (now Chief Justice) Cappy, in his Concurring and Dissenting Opinion, which was joined by Justices Castille and Newman, wrote that while a party could properly supplement their response in opposition to a motion for summary judgment, Pa.R.C.P. 1035.3(c) provides trial judges with the discretion to decide whether it will accept or reject the supplemental material. *Id.* at 785–86.

Justice Saylor, while agreeing with the decision to remand wrote in his Concurring Opinion, that in the absence of an order im-

posing preclusive sanctions for failure to comply with discovery, under Pa.R.C.P. §§ 4019 and 212.2(c), Rule 1035.3(b) provides the non-moving party with thirty days to supplement the record in response to a summary judgment motion. *Id.* at 783–84.

Justice Nigro, in his dissent wrote, "I do not read Rule 1035(b), regarding responses to summary judgment motions as permitting the responding party to supplement the record without limitation after discovery is closed. In my view, in order to avoid eviscerating the statewide rules of discovery, permissible 'supplementation' under Rule 1035.3(b) after discovery has ended must be limited to materials that the supplementing party was not previously obligated to provide its opponent pursuant to the Rules of Civil Procedure or court order." *Id.* at 788. Former Chief Justice Flaherty did not participate in the decision.

or empirical data for support) (citing *Checchio v. Frankford Hospital*, 717 A.2d 1058, 1062 (1998)) (affirmed summary judgment when expert opinion was based entirely on subjective assessments). We find that the opinions of Dr. Blumberg, read individually or as one, fail to set forth a genuine issue of material fact necessary to establish a prima facie case of gross negligence. Accordingly, summary judgment was properly entered for Crozer.

### III. CONCLUSION

¶ 23 For the reasons stated above, in reviewing the record in the light most favorable to Downey, since Downey has failed to adduce sufficient evidence on the issue of gross negligence, Crozer is entitled to judgment as a matter of law. We, therefore, find no abuse of discretion or error of law in the trial court's order granting summary judgment.

¶ 24 Order affirmed.

¶ 25 President Judge DEL SOLE files a Concurring and Dissenting Opinion in which McEWEN, P.J.E., JOYCE and TODD, JJ. join.

DEL SOLE, P.J., Concurring and Dissenting.

¶ 1 I agree with the Majority's conclusion that the Pennsylvania Mental Health Procedures Act applies in this case. I further support the Majority's application of the definition of the term "gross negligence" as set forth by our Supreme Court in *Bloom v. Dubois Regional Medical Center*, 409 Pa.Super. 83, 597 A.2d 671 (1991) and in *Albright v. Abington Memorial Hospital*, 548 Pa. 268, 696 A.2d 1159, 1164 (1997). I depart from the Majority in its conclusion that the facts as developed in this case, including the expert report of Dr. Blumberg, are unable to support a finding of gross negligence as a matter of law.

¶ 2 The Majority makes much of the fact that the expert classified Crozer's action as gross negligence only in his supplemental report. They assert he made no effort to supplement the facts on which he based his opinion, but only sought to modify his opinion as to the degree of negligence. Majority opinion at 528. I perceive of no need for Dr. Blumberg to have supplemented the facts. The facts established that Appellant's decedent required direct supervision of her daily living activities and assistance with bathing. Despite a history of a prior accident requiring medical care while bathing, the decedent's bathing activities were not monitored and she drowned while an inpatient at Appellee's facility. Dr. Blumberg in his report wrote:

> Although the staff at the Crozer–Chester Medical Center adequately diagnosed her condition and were attempting to treat her behavioral difficulties, it is quite clear, even from their own records, that Ms. Downey required direct supervision of all of her activities, including bathing and showering. Her tendency to be confused and out of control of her behavior, along with problems of dizziness, orthostasis and a prior history of seizures required that she be directly supervised at all times. Her prior history in March, 1995 of fracturing her ankle while bathing placed the hospital on even greater notice that she was physically incapable of safely handling even bathing. The hospital staff's failure to directly monitor Ms. Downey, in my opinion, directly led to her death by drowning.

This report recounts the facts supporting Crozer's responsibility for the decedent's death. The fact that the initial report was unaccompanied by the expert's conclusion that Crozer's conduct resulted in gross

negligence is of no moment. The ultimate classification of a defendant's conduct is not for the expert to conclude, but rather it is either a matter of law in a clear case or a question for a jury. The Majority's statement that we "are unable to afford any weight to what appears to be an upward modification of [the expert's] earlier professional opinion," Majority opinion at 527, is inappropriate in that "we" are not in the position to afford "weight" to the expert's opinion, for that is a matter for the jury. A court is to take the question of negligence away from a jury only where the issue can be decided as a matter of law, where the case is entirely free from doubt and no reasonable jury could find gross negligence. *Albright*, 696 A.2d at 1165. On the facts of this case, I don't believe that such action is warranted.

¶ 3 In *Albright* the court concluded that no reasonable jury could have found that the Hospital acted in a grossly negligent manner. *Id.* at 1167. In so ruling it contrasted its case to the facts present in *Willett v. Evergreen Homes, Inc., et al.*, 407 Pa.Super. 141, 595 A.2d 164 (1991). In *Willett* the Superior Court noted in *dicta* that the trial court had denied summary judgment in favor of Evergreen Homes because "the institution knew of the decedent's history of seizures, knew of the importance of monitoring decedent, and yet, left the decent unattended in the bathtub." *Id.* at fn. 8. The *Albright* Court found the circumstances in *Willett* different than the ones present before it. It stated:

> The decedent in *Willett* was an inpatient under the direct and immediate care, supervision and control of Evergreen Homes, here, Mrs. Albright was an outpatient living at home. Also, as the decedent in *Willett* had epilepsy, Evergreen Homes was aware of the immediate need to constantly monitor the decedent's bathing activities, where here, the

> Hospital had no information on which to believe that Mrs. Albright was a danger to herself or others.

*Id.*

¶ 4 The facts as developed in this case show the decedent was an inpatient who needed to be constantly monitored including direct supervision while bathing. Crozer failed to perform this task resulting in decedent's drowning death. I believe the *Albright* decision supports my conclusion that under these facts summary judgment was not appropriate and the question of whether Crozer acted in a grossly negligent fashion should be left for a jury to decide.