# Miller v. Geisinger Medical Center

C.P. of Montour County, no. 398 of 2003.

*Andrew E. DiPiero Jr.,* for plaintiffs.
*Benjamin Post* and *Tara Reid,* for defendants.

JAMES, *J.,* March 28, 2006—This is a medical malpractice case. On March 15, 1999, decedent was admitted to the mental health ward of defendant Geisinger Medical Center (GMC) for mental health treatment. He died in the hospital on March 18, 1999.

Extensive discovery has been completed, and the matter is scheduled for trial. Defendants have filed a "motion in limine to preclude any evidence against them at the time of trial as plaintiffs' claims are barred by the Pennsylvania Mental Health Procedures Act and summary judgment is otherwise appropriate at this time." They assert that the evidence does not establish a prima facie case for "gross negligence" by defendants, thus providing them immunity under the Mental Health Procedures Act (50 P.S. §7114).

In summary, decedent Mark Miller was admitted to GMC on March 15, 1999, for inpatient mental health treatment. He was primarily treated with medication. He died on March 18, 1999, at the hospital. Plaintiffs allege that his death was the result of overmedication. In what is in essence a summary judgment motion, defendants assert immunity from liability. The issue is whether, under the undisputed facts of this case, as a matter of law, defendants' acts or omissions constitute gross negligence. If so, they are not immune from liability. If not, they are immune from liability.

The Mental Health Procedures Act states:

"It is the policy of the Commonwealth of Pennsylvania to seek to assure the availability of adequate treatment to persons who are mentally ill, and it is the purpose of this act to establish procedures whereby this policy can be effected. The provisions of this act shall be interpreted in conformity with the principles of due process to make voluntary and involuntary treatment available where the need is great and its absence could result in serious harm to the mentally ill person or to others. Treatment on a voluntary basis shall be preferred to involuntary treatment; and in every case, the least restrictions consistent with adequate treatment shall be employed. Persons who are mentally retarded, senile, alcoholic, or drug dependent shall receive mental health treatment only if they are also diagnosed as mentally ill, but these conditions of themselves shall not be deemed to constitute mental illness." 50 P.S. §7102 (Statement of Policy).

Furthermore:

"Adequate treatment means a course of treatment designed and administered to alleviate a person's pain and

distress and to maximize the probability of his recovery from mental illness. It shall be provided to all persons in treatment who are subject to this act. It may include inpatient treatment, partial hospitalization, or outpatient treatment. Adequate inpatient treatment shall include such accommodations, diet, heat, light, sanitary facilities, clothing, recreation, education and medical care as are necessary to maintain decent, safe and healthful living conditions. Treatment shall include diagnosis, evaluation, therapy, or rehabilitation needed to alleviate pain and distress and to facilitate the recovery of a person from mental illness and shall also include care and other services that supplement treatment and aid or promote such recovery." 50 P.S. §7104 (Provision for Treatment).

In the defining case of *Allen v. Montgomery Hospital,* 548 Pa. 299, 307, 696 A.2d 1175, 1179 (1997), the Pennsylvania Supreme Court decided that "treatment" included treatment for other ailments while the patient was treated for mental illness. The court stated:

"Therefore, applying the rules of statutory construction to the immunity provision of section 114 of the MHPA, we conclude that the General Assembly decided to ameliorate certain risks *by granting limited immunity to doctors and hospitals who have undertaken the treatment of the mentally ill, including treatment for physical ailments* pursuant to a contract with a mental health facility to provide such treatment. Policy reasons also support this interpretation of the immunity provision in section 114 of the MHPA. If the provision were interpreted narrowly such as urged by appellees so that it only applied to treatment specifically directed at a mental ill-

ness, it could reduce or eliminate the willingness of doctors or hospitals to provide needed medical care to a mentally ill patient who is referred by a mental hospital for medical treatment. Even if doctors or hospitals still provided treatment for physical ailments in such a situation, it could lead such providers of medical care to minimize their risks by placing the mentally ill patients in a more restrictive environment than is necessary or adopting other precautionary measures which would increase the costs of the medical care provided to the mentally ill." (emphasis provided)

A subsequent Pennsylvania Superior Court case added:

"The immunity provision of the MHPA provides in pertinent part as follows:

"Section 7114. Immunity from civil and criminal liability

"(a) In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be examined or treated under this act, . . . shall not be civilly or criminally liable for such decision or for any of its consequences. 50 P.S. §7114(a). Under the MHPA, a 'facility' is 'any mental health establishment, hospital, clinic, institution, center, day care center, base service unit, community mental health center, or part thereof, that provides for the diagnosis, treatment, care or rehabilitation of mentally ill persons, whether as outpatients or inpatients.' 50 P.S. §7103. 'Treatment' is defined as 'diagnosis, evaluation, therapy, or rehabilitation needed to alleviate pain and distress and to facilitate the recovery of a

person from mental illness and shall also include care and other services that supplement treatment and aid or promote such recovery.' 50 P.S. §7104. Thus, we must determine if Crozer was a 'facility' providing treatment to defendant for, if it was, Crozer is immune from suit in the absence of 'gross negligence.'

"Our Supreme Court has determined that the immunity provided by the MHPA extends to institutions, as well as natural persons, that provide care to mentally ill patients. *Farago v. Sacred Heart General Hospital,* 522 Pa. 410, 562 A.2d 300, 303 (1989). Additionally, our Supreme Court has interpreted section 7114(a) to include not only treatment decisions, but also, ' "care and other services that supplement treatment" in order to promote the recovery of the patient from mental illness.' *Allen v. Montgomery Hospital,* 548 Pa. 299, 696 A.2d 1175, 1179 (1997).

"As a hospital that provides inpatient psychiatric care, Crozer is most certainly an institution to which the provisions of the MHPA apply. See *Farago,* 562 A.2d at 303. Decedent was involuntarily committed to the inpatient psychiatric care of Crozer, and its staff monitored decedent as part of her medical care. In *Allen,* our Supreme Court interpreted the MHPA to apply to the daily care and other services provided to a patient as part of the patient's overall psychiatric treatment. See *Allen,* 696 A.2d at 1179. Therefore, we conclude that the MHPA applies to Crozer and consequently, that the trial court did not err by applying its immunity provisions when it granted summary judgment." *Downey v. Crozer-Chester Medical Center,* 817 A.2d 517, 524-25 (Pa. Super. 2003).

Thus, it has been determined by the Pennsylvania courts that the immunity provision of the Mental Health Procedures Act applies to any treatment a patient is receiving in a medical/mental health facility incidental to his or her mental health treatment. In case at bar, there is no question that the complained of treatment was incidental to decedent's mental health treatment. Therefore, the controlling issue is whether the defendants' actions present a question for a jury or whether gross negligence has not been established sufficiently to present to a jury.

The Superior Court has recently reiterated the definition of "gross negligence":

"Clearly in this case patient is not attempting to prove willful misconduct; therefore, her burden would be to present sufficient facts to the jury from which it could making [sic] a finding of gross negligence.

"Our Supreme Court adopted this court's definition of gross negligence in *Albright v. Abington Memorial Hospital,* 548 Pa. 268, 696 A.2d 1159 (1997):

" 'It appears that the legislature intended to require that liability be premised on facts indicating more egregiously deviant conduct than ordinary carelessness, inadvertence, laxity, or indifference. We hold that the legislature intended the term gross negligence to mean a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference. The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care.' *Id.* at 278, 696 A.2d at 1164, quoting *Bloom v. DuBois Regional Medical Center,* 409 Pa. Super. 83, 597 A.2d 671,

679 (1991)." *Walsh v. Borczon,* 881 A.2d 1, 7 (Pa. Super. 2005).

In light of the definition of gross negligence, we must decide when a case involving gross negligence is appropriate for jury determination and when is it appropriate for court determination. The Pennsylvania courts have clearly addressed this issue and established the standard for when a court should decide the issue as a matter of law:

"We recognize that the limited immunity provided by section 7114 would mean little if the persons or entities covered by that provision were required to undergo trial in every case and leave it to a jury to determine if the complained of misdeeds (if there were any) rose to the level of gross negligence.

"On the very issue of whether the jury has the sole right to determine gross negligence, Justice Cappy declared:

"While it is generally true that the issue of whether a given set of facts satisfies the definition of gross negligence is a question of fact to be determined by a jury, a court may take the issue from a jury, and decide the issue as a matter of law, if the conduct in question falls short of gross negligence, the case is entirely free from doubt, and no reasonable jury could find gross negligence. *Id. (Albright)* at 1164-65, citing *Willett v. Evergreen Homes Inc.,* 407 Pa. Super. 141, 595 A.2d 164 (1991), *alloc. denied,* 529 Pa. 623, 600 A.2d 539 (1991)." *Downey v. Crozer-Chester Medical Center,* 817 A.2d 517, 525-26 (Pa. Super. 2003).

Thus, based on the undisputed facts, our determination is whether the conduct of the defendants falls short

of gross negligence, whether the case is entirely free from doubt, and whether no reasonable jury could find gross negligence. Plaintiffs argue that even if the acts or omissions of each individual defendant amount to negligence, not gross negligence, their combined negligence amounts to gross negligence. Plaintiffs argue that the resulting gross negligence of the "group" of individuals renders the individual defendants grossly negligent, even though their individual acts constituted ordinary negligence. Plaintiffs cite no authority for this proposition, and the court knows of no legal theory which would subject an individual defendant to liability for gross negligence allegedly created by the independent actions of several people, with the exception of vicarious liability. Thus, this court will determine whether a prima facie case for gross negligence has been established for each defendant.

These are the facts of this case as alleged by plaintiffs and evidenced through numerous depositions, medical records and expert reports. Decedent, Mark Miller, age 27, was admitted to the inpatient psychiatric unit of GMC on March 15, 1999, for further assessment and treatment of major depression. He had been expressing suicidal ideations during outpatient treatment. He also had a history of chronic pain from an eight-year-old vehicle accident and had heart problems treated with a pacemaker. On admission he was kept on his outpatient medications. The next day (March 16, 1999), per admitting physician defendant Doctor Paolucci, the medications were changed, including adding methadone and Librium. On March 17, 1999, per physician assistant Albright (who was supervised by defendant Doctor Baxter), the dose

of methadone was increased. In accordance with that increase, the physician assistant ordered an increase in the frequency of vital sign monitoring from twice a day to "please check vital signs at shift change." Friends and relatives found decedent to be sleepy during the day of March 17. The records indicate that he was somnolent at 2 p.m. on March 17.

At midnight at the start of March 18, 1999, he was awake with other patients. His vital signs were taken at midnight, just before he went to bed and the vital signs were found to be good and steady. At 1 a.m. on March 18, he was sleeping in his bed. Defendant Nurse Wolfe and/or other nurses saw him asleep hourly thereafter through the night. At 6 a.m. defendant Nurse Lauffer[1] checked on decedent and found him to be difficult to arouse and sedated. Defendant Nurse Lauffer checked decedent's vital signs which continued to be good, consistent, and in accord with the vital signs of the last day and one-half. However, immediately, defendant Nurse Lauffer called defendant Doctor Hoffer (a psychiatrist who dealt with outpatient care but who was on call at home) to inquire as to whether decedent's medication could be withheld in light of his condition. Defendant Nurse Lauffer told defendant Doctor Hoffer that decedent "appeared to be sedated, that he was arousable, that his vital signs—I gave him his vital signs, specifically as to what they were. And I informed him that they were consistent with what had been taken at midnight." Defendant Doctor Hoffer gave permission to withhold the medication and directed that the patient be evaluated later

---

1. Nurse Lauffer is referred to as "Lauffler" in the caption.

at the beginning of the day shift, or in the morning. Defendant Nurse Lauffer did nothing else for decedent and finished other work. He returned to decedent's room at 6:55 p.m. and found the decedent in cardiopulmonary arrest. Decedent was pronounced dead at 7:35 a.m.

The question is whether any of the parties were grossly negligent in causing decedent's death. Plaintiff has several expert reports addressing the issue of negligence and assigning responsibility. However, it is troublesome that most of these allegations of negligence or gross negligence lump defendants together without explaining what each defendant did or did not do that amounted to gross negligence. Although Dr. Eric Fine opines that decedent would have survived had he been treated within the accepted standard of care, he assigns blame generally by saying there was a gross deviation from the accepted standard of care "by his physicians and nursing staff at Geisinger Medical Center." Likewise, Dr. Cyril Wecht opines that "Mr. Mark Miller died as a direct result of the toxic effects of the combination of several drugs that depressed his central nervous system. More frequent check-ups after midnight would have detected increasing respiratory depression and thereby would have led to appropriate and timely intervention, which would have prevented his death." There is no specific assignment of negligence to any individual. In addition, without assigning individual liability to any one person, Dr. Harold Palevsky states that "[t]he failure of the staff at Geisinger Medical Center and the physicians involved in Mr. Miller's care to recognize the potential for respiratory compromise from the medications he was on, the failure to administer any antagonists for either narcotics (metha-

done) or benzodiazepines (Librium) was a deviation from accepted standards of practice."

Three other plaintiff experts are more specific. Nursing expert Jeanne Geiger-Brown, Ph.D., APRN, BC, states that generally "the professional accountability for monitoring his condition and acting on those observations was not clear." But this is not a corporate liability case dealing with faulty procedures and protocols. This is a case against individual defendants and against GMC based on vicarious liability. However, Dr. Geiger-Brown does assign individual liability to defendant Nurse Lauffer.

Similarly, Richard A. Pessagno, MSN, APRN, BS, generally criticizes the nursing care for decedent from midnight until 6:55 a.m. on March 18. He says that the "lack of monitoring of Mr. Miller's condition" was below the standard of care. Specifically, he states that Nurse Lauffer acted below the standard of care when he left decedent alone and unattended after 6 a.m. He also opines that there was no "code cart actually on the psychiatric unit when Mr. Miller needed to be resuscitated" and that this was below the standard of care.

Dr. Fayer assigns general liability and specific liability. Generally, he says that "Drs. Paolucci, Hoffer and Baxter all deviated from care consistent with that of a trained psychiatrist, internist and resident respectively and did not employ prudence in meeting standards of care." Specifically, he makes several direct criticisms of Dr. Paolucci. He states that Dr. Paolucci failed to "conduct a proper and appropriate medical work-up for his medical condition," *i.e.,* a cardiac work-up. Second, he

states that Dr. Paolucci "failed to prescribe, manage and administer appropriate medications for the treatment of his major depressive disorder and detoxification from opoid analgesics (Vicodin). Dr. Paolucci did not appreciate the drug-drug interactions of the various medications." Third, he says that "Dr. Paolucci did not communicate concerns regarding the clinical status and interaction of various medications with Dr. Baxter, who was called to consult in regard to detoxification." Finally, he says that "[t]here was a failure on the part of Dr. Paolucci as the attending of Mark Miller and the other physicians who were involved in his treatment to follow the procedures for medical situations on the unit set up by the Geisinger Medical Center for Inpatient Psychiatry Procedure no. 18. I note that for medical problems during off hours which are judged to be serious, a nurse will remain with the patient, observe and care for the patient, and document findings in the medical unit. This was not done and the serious state with obvious somnolence and possible respiratory depression was not addressed on 3/18/99 after Mr. Miller was seen at 6 a.m."

With regard to Dr. Hoffer, Dr. Fayer states that when Nurse Lauffer called Dr. Hoffer, "[t]here was no discussion about the other medications that Mr. Miller was on and the only thing done was to hold the Librium. Dr. Hoffer did not at that time give an order for Mr. Miller to be examined by a physician on call. Nor was there any change in his vital signs. He did not instruct Nurse Lauffer to remain with the patient and to monitor what clearly was a very dangerous situation."

The only reference in Dr. Fayer's report about Dr. Baxter's liability (except general statements) is that "on

3/17 Dr. Baxter did not see Mr. Miller or communicate to Dr. Paolucci or to David Albright, a physician's assistant who was apparently assigned to evaluate and treat Mr. Miller under the supervision of Dr. Baxter. On 3/17 at 2 p.m. Mr. Miller was noted to be somnolent. Despite this, his methadone dosage was increased from 20 mg. b.i.d. to 30 mg. b.i.d. This was never communicated to Dr. Baxter or Dr. Paolucci. This failure to communicate Mr. Miller's clinical condition and increasing the dose of methadone knowing he was already on other medications which caused respiratory depression was clearly a gross deviation from accepted psychiatric medical practice." Query: Who committed the negligence?

In light of the expert reports and the allegation of gross negligence on the part of each defendant, it is crucial to examine the facts which plaintiffs allege establish a prima facie case for gross negligence. First, in regard to defendant Nurse Wolfe, she is alleged to have not monitored the decedent closely enough during the hours of midnight to 6 a.m. Experts Geiger-Brown and Pessagno do not address defendant Nurse Wolfe specifically, but generally state that the monitoring of decedent from midnight to 6 a.m. was below standards. There are no facts or any expert opinions which establish any negligence, gross or ordinary, on the part of defendant Nurse Wolfe. There is no cause of action against Nurse Wolfe.

Second, in regard to Doctor Baxter, the only facts alleged upon which liability is founded are that Doctor Baxter consulted on this matter and prescribed a certain regimen of medications for decedent which were increased by his physical assistant on March 17, 1999. The

only contact between decedent and Doctor Baxter was on March 16, 1999. In addition, plaintiffs' experts do not link any specific acts or admissions with any opinions which constitute flagrant acts or omissions or with acts or omissions which amount to a form of negligence substantially more that ordinary carelessness, inadvertence, laxity, or indifference. Doctor Baxter's alleged actions do not constitute a prima facie case for gross negligence.

Third, in regard to Doctor Hoffer, the only facts alleged upon which liability is founded are that he was called at home by Nurse Lauffer who asked him whether decedent's medications could be withheld that morning. Doctor Hoffer received similar calls quite often about seemingly sedated patients. In this case he was told by Nurse Lauffer that Mark Miller's vital signs were good and consistent and that Mark Miller was arousable and could open his eyes. Plaintiffs' only expert who speaks directly to Dr. Hoffer's alleged negligence is Dr. Fayer. Dr. Fayer says that "Dr. Hoffer did not at that time give an order for Mr. Miller to be examined by a physician on call. Nor was there any change in vital signs. He did not instruct Nurse Lauffer to remain with the patient and to monitor what clearly was a very dangerous situation." Even if these allegations, under the circumstances, amounted to ordinary negligence, Doctor Hoffer's alleged actions were not flagrant and do not amount to a form of negligence substantially more than ordinary carelessness, inadvertence, laxity, or indifference. These actions do not amount to gross negligence.

Fourth, in regard to Doctor Paolucci, the only facts alleged upon which liability is founded are that he was

the admitting physician and, thus, the attending physician to Mark Miller. Upon admission, he examined Mark Miller. He had no contact with him after that time. Once again, plaintiffs' only expert who speaks directly to Dr. Paolucci's alleged negligence is Dr. Fayer. Dr. Fayer says that Doctor Paolucci failed "to conduct a proper and appropriate medical work-up for his medical difficulties." Dr. Fayer referred to his heart problems. However, plaintiffs' pathologist, Dr. Wecht opines that "Mark Miller died as a result of the toxic effects of the combination of several drugs that depressed the central nervous system." There is no connection with this allegation of negligence and Mark Miller's death.

Dr. Fayer also states that Dr. Paolucci failed to "prescribe, manage and administer appropriate medications for the treatment of his major depressive disorder and detoxification from opoid analgesics (Vicodin). Dr. Paolucci did not appreciate the drug-drug interactions of the various medications Mr. Miller was placed on while a patient in the hospital. This included Librium, methadone, Efflexor, Benadryl, Depakote, and Trazodone. All of these medications together have an addictive effect in relation to side effects including sedation and respiratory depression." In light of the alleged acts or omissions of Dr. Paolucci and the expert opinion that these acts or omissions amounted to negligence, there is nothing in the record or expert opinion which would lead a reasonable jury to conclude that these alleged acts of negligence rise to the level of gross negligence. There is nothing to indicate that Dr. Paolucci's alleged acts or omissions were flagrant or substantially greater than ordinary negligence.

Dr. Fayer also states that:

"Dr. Paolucci did not communicate concerns regarding the clinical status and interaction of various medications with Dr. Baxter who was called in to consult in regard to detoxification. I should also note that Mr. Miller was not seen by Dr. Baxter on a daily basis while in the hospital. In fact, on 3/17 Dr. Baxter did not see Mr. Miller or communicate to Dr. Paolucci or to David Albright, a physician's assistant who was apparently assigned to evaluate and treat Mr. Miller under the supervision of Dr. Baxter. On 3/17 at 2 p.m. Mr. Miller was noted to be somnolent. Despite this his methadone dosage was increased from 20 mg. b.i.d. to 30 mg. b.i.d. This was never directly communicated to Dr. Baxter or Dr. Paolucci. This failure to communicate Mr. Miller's clinical condition and increasing the dose of methadone knowing he was already on other medications which caused respiratory depression was clearly a gross deviation from accepted psychiatric medical practice."

"This failure to communicate" seems to lump unspecified defendants together and to add their respective allegations of failure to communicate together to establish gross negligence. Certainly, there is nothing in the record to indicate that Dr. Paolucci's alleged acts or omissions were flagrant or substantially greater than ordinary negligence. "An expert's opinion must be supported by references to facts, testimony or empirical data and must delineate how the opinion, based on the record, gives rise to a genuine issue of material fact. Without such support, there can be no prima facie case of gross negligence sufficient to overcome a summary judgment motion. *Kenner v. Kappa Alpha Psi Fraternity Inc.,* 808 A.2d

178 (Pa. Super. 2002) (affirming entry of summary judgment, where an expert's opinion contained within a report, failed to point to specific facts, testimony or empirical data for support) (citing *Checchio v. Frankford Hospital*, 717 A.2d 1058, 1062 (Pa. Super. 1998)) (affirmed summary judgment when expert opinion was based entirely on subjective assessments)." *Downey v. Crozer-Chester Medical Center*, 817 A.2d 517, 528-29 (Pa. Super. 2003). The facts referred to by the expert regarding Dr. Paolucci simply do not give rise to a prima facie case for gross negligence. Simply using the magic words "gross negligence" in the expert report does not give rise to a prima facie case for gross negligence without sufficient supporting facts. Moreover, Dr. Fayer's allegation of gross negligence appears to arise from the increase in the methadone dosage, which was not prescribed by Dr. Paolucci.

Finally, Dr. Fayer says that:

"There was a failure on the part of Dr. Paolucci as the attending of Mark Miller and the other physicians who were involved in his treatment to follow the procedures for medical situations on the unit set up by the Geisinger Medical Center for Inpatient Psychiatry Procedure no. 18. I note that for medical problems during off hours which are judged to be serious, a nurse will remain with the patient, observe and care for the patient and document findings in the medical unit. This was not done and the serious clinical state with obvious somnolence and possible respiratory depression was not addressed on 3/18/99 after Mr. Miller was seen at 6 a.m."

This allegation of negligence cannot be defined as flagrant nor is it an allegation of more than ordinary negli-

gence. In fact, it appears to address the acts or omissions of the nursing staff or nurses individually rather than the physicians. It certainly does not rise to the level of gross negligence on behalf of Dr. Paolucci.

In regard to defendant Nurse Lauffer, expert Dr. Geiger-Brown refers to Nurse Lauffer's acts or omissions between 6 a.m. and 6:55 a.m. Dr. Geiger-Brown states that Nurse Lauffer "did not remain with the patient, nor direct the other R.N. that was present on the shift to continuously monitor the patient. He did not summon a physician to come and examine the patient. *This is a failure to rescue.* At the point where Mr. Lauffer made the decision to leave the patient unattended, he had no way of knowing if the patient's level of consciousness was ascending or descending. There was no call placed to a nursing supervisor who could have obtained additional staff to assist with the care of this patient, or arranged for a transfer to a medical unit once seen by a physician." Under the circumstances, Dr. Geiger-Brown adds that "[l]eaving a patient alone without monitoring would be unthinkable. Mr. Lauffer correctly held the Librium medication. What he did NOT do is seek immediate medical attention for the patient (*i.e.,* calling a physician to the patient's bedside), and remain with him to continuously monitor the patient's vital signs and airway." Although he called Dr. Hoffer at home, the call primarily dealt with withholding medications. Dr. Hoffer was told that the patient's vital signs were consistent and that he was arousable. Dr. Geiger-Brown opines that among other things, Nurse Lauffer should have summoned an in-house doctor to address issues with Mark Miller. The alleged facts and Dr. Geiger-Brown's expert report es-

tablish a prima facie case for gross negligence vis-à-vis Nurse Lauffer which could be considered by a jury.

Finally, defendant GMC may be vicariously liable for the acts or omissions of defendant Nurse Lauffer. Thus, GMC shall remain a defendant in this case on that basis. This court has ruled pursuant to the parties' stipulation that GMC is not liable corporately. However, plaintiffs alleged that GMC is still vicariously liable for not only the alleged gross negligence of Nurse Lauffer, but also for the ordinary negligence of all of the individual defendants, the combination of which, they allege, amounts to gross negligence. This court will defer ruling on this issue until the parties further brief this issue and argue/discuss the issue with the court.

## ORDER

And now, March 28, 2006, after consideration of defendants' "motion in limine to preclude any evidence against them at the time of trial as plaintiffs' claims are barred by the Pennsylvania Mental Health Procedures Act and summary judgment is otherwise appropriate at this time," summary judgment is granted in regard to defendants Stephen J. Paolucci M.D., Scott Hoffer M.D., L.E. Baxter M.D., and Christina Wolfe RNC, and is denied in regard to defendants Geisinger Medical Center and James Lauffer.